# UNION ELECTRIC CO. *v.* ENVIRONMENTAL PROTECTION AGENCY ET AL.

No. 74–1542.   Argued January 21, 1976—Decided June 25, 1976

248

MARSHALL, J., delivered the opinion for a unanimous Court. POWELL, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 269.

*William H. Ferrell* argued the cause and filed briefs for petitioner.

*Assistant Attorney General Taft* argued the cause for respondent Environmental Protection Agency. With him on the brief were *Solicitor General Bork, Deputy Solicitor General Randolph,* and *Edmund B. Clark. John C. Danforth,* Attorney General of Missouri, *pro se,* and *Walter W. Nowotny, Jr.,* and *Dan Summers,* Assistant Attorneys General, filed briefs for respondents Danforth et al.*

---

*Briefs of *amici curiae* urging reversal were filed by *H. Edward Dunkelberger, Jr., Theodore L. Garrett,* and *A. Joseph Dowd* for the Appalachian Power Co. et al.; by *Cameron F. MacRae,*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

After the Administrator of the Environmental Protection Agency (EPA) approves a state implementation plan under the Clean Air Act, the plan may be challenged in a court of appeals within 30 days, or after 30 days have run if newly discovered or available information justifies subsequent review. We must decide whether the operator of a regulated emission source, in a petition for review of an EPA-approved state plan filed after the original 30-day appeal period, can raise the claim that it is economically or technologically infeasible to comply with the plan.

I

We have addressed the history and provisions of the Clean Air Amendments of 1970, Pub. L. 91–604, 84 Stat. 1676, in detail in *Train* v. *Natural Resources Defense Council (NRDC)*, 421 U. S. 60 (1975), and will not repeat that discussion here. Suffice it to say that the Amendments reflect congressional dissatisfaction with the progress of existing air pollution programs and a determination to "tak[e] a stick to the States," *id.*, at 64, in order to guarantee the prompt attainment and maintenance of specified air quality standards. The heart of the Amendments is the requirement that each State formulate, subject to EPA approval, an implementation plan designed to achieve national primary ambient air quality standards—those necessary to protect the public health—"as expeditiously as practicable but . . . in no case later than three years from the date of ap-

*Harry H. Voigt,* and *Henry V. Nickel* for the Edison Electric Institute; and by *Ronald A. Zumbrun* and *Raymond M. Momboisse* for the Pacific Legal Foundation.

*Lewis C. Green* filed a brief for Coalition for the Environment, St. Louis Region, as *amicus curiae* urging affirmance.

proval of such plan." § 110 (a)(2)(A) of the Clean Air Act, as added, 84 Stat. 1680, 42 U. S. C. § 1857c–5 (a)(2) (A). The plan must also provide for the attainment of national secondary ambient air quality standards— those necessary to protect the public welfare—within a "reasonable time." *Ibid.* Each State is given wide discretion in formulating its plan, and the Act provides that the Administrator "shall approve" the proposed plan if it has been adopted after public notice and hearing and if it meets eight specified criteria. § 110 (a)(2).[1]

---

[1] Section 110 (a)(2), 42 U. S. C. § 1857c–5 (a)(2), provides in full:

"The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

"(A)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e)) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

"(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls;

"(C) it includes provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and, (ii) upon request, make such data available to the Administrator;

"(D) it includes a procedure, meeting the requirements of paragraph (4), for review (prior to construction or modification) of the location of new sources to which a standard of performance will apply;

"(E) it contains adequate provisions for intergovernmental co-

On April 30, 1971, the Administrator promulgated national primary and secondary standards for six air pollutants he found to have an adverse effect on the public health and welfare. 40 CFR pt. 50 (1975). See § 108 (a) of the Act, as added, 84 Stat. 1678, 42 U. S. C. § 1857c–3 (a). Included among them was sulfur dioxide, at issue here. 40 CFR §§ 50.4–50.5 (1975). After the promulgation of the national standards, the State of Missouri formulated its implementation plan and submitted it for approval. Since sulfur dioxide levels exceeded national primary standards in only one of the

operation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region;

"(F) it provides (i) necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan, (ii) requirements for installation of equipment by owners or operators of stationary sources to monitor emissions from such sources, (iii) for periodic reports on the nature and amounts of such emissions; (iv) that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this Act, which reports shall be available at reasonable times for public inspection; and (v) for authority comparable to that in section 303, and adequate contingency plans to implement such authority;

"(G) it provides, to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards; and

"(H) it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standard which it implements."

State's five air quality regions—the Metropolitan St. Louis Interstate region, 40 CFR § 52.1321 (1975)—the Missouri plan concentrated on a control strategy and regulations to lower emissions in that area. The plan's emission limitations were effective at once, but the State retained authority to grant variances to particular sources that could not immediately comply.[2] Mo. Rev. Stat. § 203.110 (1972). The Administrator approved the plan on May 31, 1972. See 40 CFR § 52.1320 *et seq.* (1975).

Petitioner is an electric utility company servicing the St. Louis metropolitan area, large portions of Missouri, and parts of Illinois and Iowa. Its three coal-fired generating plants in the metropolitan St. Louis area are subject to the sulfur dioxide restrictions in the Missouri implementation plan. Petitioner did not seek review of the Administrator's approval of the plan within 30 days, as it was entitled to do under § 307 (b)(1) of the Act, as added, 84 Stat. 1708, 42 U. S. C. § 1857h–5 (b)(1), but rather applied to the appropriate state and county agencies for variances from the emission limitations affecting its three plants. Petitioner received one-year variances, which could be extended upon reapplication. The variances on two of petitioner's three plants had expired and petitioner was applying for extensions when, on May 31, 1974, the Administrator notified petitioner that sulfur dioxide emissions from its plants violated the emission limitations contained in the Missouri plan.[3] See 40 Fed. Reg. 3566 (1975). Shortly there-

---

[2] The plan was designed to attain primary and secondary air quality standards in the Metropolitan St. Louis Interstate region by July 1975. See 40 CFR § 52.1332 (1975).

[3] The notice included all three plants, even though the variance on one of them had not yet expired, because the one variance still in effect had not been submitted to the EPA as a plan revision

after petitioner filed a petition in the Court of Appeals for the Eighth Circuit for review of the Administrator's 1972 approval of the Missouri implementation plan.

Section 307 (b)(1) allows petitions for review to be filed in an appropriate court of appeals more than 30 days after the Administrator's approval of an implementation plan only if the petition is "based solely on grounds arising · after such 30th day." Petitioner claimed to meet this requirement by asserting, *inter alia,* that various economic and technological difficulties had arisen more than 30 days after the Administrator's approval and that these difficulties made compliance with the emission limitations impossible.[4] The Court of Ap-

---

under § 110 (a)(3)(A), as amended, 88 Stat. 256, 42 U. S. C. § 1857c–5 (a)(3)(A) (1970 ed., Supp. IV), and therefore was not part of the applicable implementation plan. See n. 15, *infra,*

[4] Petitioner also claimed that the presence of sulfur dioxide in the ambient air should no longer be regarded as a health hazard and that compliance with the Missouri implementation plan was not necessary for attainment of national primary or secondary air quality standards. The Court of Appeals found that these claims were not sufficient to establish jurisdiction under § 307 (b)(1).

The court held that the challenge to the validity of regulating sulfur dioxide was not properly before it because the alleged new information had not previously been presented to the Administrator for action, a procedure the court held was necessary for the exercise of its jurisdiction. 515 F. 2d 206, 220 (1975). See also *Oljato Chapter of Navajo Tribe* v. *Train,* 169 U. S. App. D. C. 195, 515 F. 2d 654 (1975). In any case, the court held, the challenge was to a national air quality standard and as such could be brought only in the Court of Appeals for the District of Columbia Circuit under § 307 (b)(1). 515 F. 2d, at 220. While petitioner sought certiorari on this ruling, our grant of the writ was limited to the question whether claims of economic or technical infeasibility could be raised in a challenge to a state implementation plan. 423 U. S. 821 (1975).

The Court of Appeals also found that no claim was stated by petitioner's assertion that the Missouri standards exceeded those necessary for compliance with the national standards because, the

peals ordered briefing on the question of its subject-matter jurisdiction to hear the case and, after argument, granted the motions of the EPA and intervenor-respondents, the Attorney General of Missouri and the Missouri Air Conservation Commission, to dismiss the petition for review for lack of jurisdiction.

The court held that "only matters which, if known to the Administrator at the time of his action [in approving a state implementation plan], would justify setting aside that action are properly reviewable after the initial 30 day review period." 515 F. 2d 206, 216 (1975). Since, in the court's view, claims of economic and technological infeasibility could not properly provide a basis for the Administrator's rejecting a plan, such claims could not serve—at any time—as the basis for a court's overturning an approved plan. Accordingly, insofar as petitioner's claim of newly discovered or available information was grounded on an assertion of economic and technological infeasibility, the court held itself to be without jurisdiction to consider the petition for review, and so dismissed the petition. In so holding the Court of Appeals considered and rejected the contrary or partially contrary holdings of three other Circuits. *Buckeye Power, Inc.* v. *EPA,* 481 F. 2d 162, 168–169 (CA6 1973) (but see *id.,* at 173); *Appalachian Power Co.* v. *EPA,* 477 F. 2d 495, 505–507 (CA4 1973); *Duquesne Light Co.* v. *EPA,* 481 F. 2d 1 (CA3 1973); *Getty Oil Co.* v. *Ruckelshaus,* 467 F. 2d 349 (CA3 1972), cert. denied, 409 U. S. 1125 (1973). See also *St. Joe Minerals Corp.* v. *EPA,* 508 F. 2d 743, 746–749 (CA3 1975), vacated and remanded,

---

court held, the States are free to adopt stricter standards than the national standards under § 116 of the Clean Air Act, as amended, 84 Stat. 1689 and 88 Stat. 259, 42 U. S. C. § 1857d–1 (1970 ed., Supp. IV). 515 F. 2d, at 220. While certiorari was not sought on this question, it has been briefed for us and we find it necessary to resolve it in deciding this case. See *infra,* at 261–266.

425 U. S. 987 (1976); *Duquesne Light Co.* v. *EPA,* 522 F. 2d 1186 (CA3 1975), cert. pending, No. 75–736. On the other hand, the Eighth Circuit found support for its position in the decisions of several other Circuits. *South Terminal Corp.* v. *EPA,* 504 F. 2d 646, 675–676 (CA1 1974); *Texas* v. *EPA,* 499 F. 2d 289, 317 (CA5 1974); *Natural Resources Defense Council* v. *EPA,* 507 F. 2d 905, 914 (CA9 1974). See also *Indiana & Michigan Electric Co.* v. *EPA,* 509 F. 2d 839, 843–845 (CA7 1975). Cf. *Buckeye Power, Inc.* v. *EPA,* 525 F. 2d 80 (CA6 1975). We granted certiorari to resolve the conflict among the Circuits, 423 U. S. 821 (1975), and we now affirm.

## II

### A

We reject at the outset petitioner's suggestion that a claim of economic or technological infeasibility may be considered upon a petition for review based on new information and filed more than 30 days after approval of an implementation plan even if such a claim could not be considered by the Administrator in approving a plan or by a court in reviewing a plan challenged within the original 30-day appeal period. In pertinent part § 307 (b)(1) provides:

> "A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such 30th day."

Regardless of when a petition for review is filed under § 307 (b)(1), the court is limited to reviewing "the Ad-

ministrator's action in approving . . . [the] implementation plan . . . ." Accordingly, if new "grounds" are alleged, they must be such that, had they been known at the time the plan was presented to the Administrator for approval, it would have been an abuse of discretion for the Administrator to approve the plan. To hold otherwise would be to transfer a substantial responsibility in administering the Clean Air Act from the Administrator and the state agencies to the federal courts.

## B

Since a reviewing court—regardless of when the petition for review is filed—may consider claims of economic and technological infeasibility only if the Administrator may consider such claims in approving or rejecting a state implementation plan, we must address ourselves to the scope of the Administrator's responsibility. The Administrator's position is that he has no power whatsoever to reject a state implementation plan on the ground that it is economically or technologically infeasible, and we have previously accorded great deference to the Administrator's construction of the Clean Air Act. See *Train* v. *NRDC*, 421 U. S., at 75. After surveying the relevant provisions of the Clean Air Amendments of 1970 and their legislative history, we agree that Congress intended claims of economic and technological infeasibility to be wholly foreign to the Administrator's consideration of a state implementation plan.

As we have previously recognized, the 1970 Amendments to the Clean Air Act were a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution. The Amendments place the primary responsibility for formulating pollution control strategies on the States, but nonetheless subject

the States to strict minimum compliance requirements. These requirements are of a "technology-forcing character," *Train* v. *NRDC, supra,* at 91, and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible.

This approach is apparent on the face of § 110 (a)(2). The provision sets out eight criteria that an implementation plan must satisfy, and provides that if these criteria are met and if the plan was adopted after reasonable notice and hearing, the Administrator "shall approve" the proposed state plan. The mandatory "shall" makes it quite clear that the Administrator is not to be concerned with factors other than those specified, *Train* v. *NRDC, supra,* at 71 n. 11, 79, and none of the eight factors appears to permit consideration of technological or economic infeasibility.[5] Nonetheless, if a basis is to be found for allowing the Administrator to consider such claims, it must be among the eight criteria, and so it is here that the argument is focused.

It is suggested that consideration of claims of technological and economic infeasibility is required by the first criterion—that the primary air quality standards be met "as expeditiously as practicable but . . . in no case later than three years . . ." and that the secondary air

---

[5] See n. 1, *supra.* Comparison of the eight criteria of § 110 (a)(2) with other provisions of ·the Amendments bolsters this conclusion. Where Congress intended the Administrator to be concerned about economic and technological infeasibility, it expressly so provided. Thus, §§ 110 (e), 110 (f), 111 (a)(1), 202 (a), 211 (c)(2)(A), and 231 (b) of the Amendments all expressly permit consideration, *e. g.,* "of the requisite technology, giving appropriate consideration to the cost of compliance." § 231 (b), as added, 84 Stat. 1704, 42 U. S. C. § 1857f–9 (b). See also 42 U. S. C. §§ 1857c–5 (e), 1857c–5 (f), 1857c–6 (a)(1), 1857f–1 (a), 1857f–6c (c)(2)(A). Section 110 (a)(2) contains no such language.

quality standards be met within a "reasonable time." § 110 (a)(2)(A). The argument is that what is "practicable" or "reasonable" cannot be determined without assessing whether what is proposed is possible. This argument does not survive analysis.

Section 110 (a)(2)(A)'s three-year deadline for achieving primary air quality standards is central to the Amendments' regulatory scheme and, as both the language and the legislative history of the requirement make clear, it leaves no room for claims of technological or economic infeasibility. The 1970 congressional debate on the Amendments centered on whether technology forcing was necessary and desirable in framing and attaining air quality standards sufficient to protect the public health, standards later termed primary standards. The House version of the Amendments was quite moderate in approach, requiring only that health-related standards be met "within a reasonable time." H. R. 17255, 91st Cong., 2d Sess., § 108 (c)(1)(C)(i) (1970). The Senate bill, on the other hand, flatly required that, possible or not, health-related standards be met "within three years." S. 4358, 91st Cong., 2d Sess., § 111 (a)(2)(A) (1970).

The Senate's stiff requirement was intended to foreclose the claims of emission sources that it would be economically or technologically infeasible for them to achieve emission limitations sufficient to protect the public health within the specified time. As Senator Muskie, manager of the Senate bill, explained to his chamber:

> " 'The first responsibility of Congress is not the making of technological or economic judgments—or even to be limited by what is or appears to be technologically or economically feasible. Our responsibility is to establish what the public interest requires to protect the health of persons. This may

mean that people and industries will be asked to do what seems to be impossible at the present time.' " 116 Cong. Rec. 32901–32902 (1970).

See also *id.*, at 32919 (remarks of Sen. Cooper); 33115 (remarks of Sen. Prouty). This position reflected that of the Senate committee:

> "In the Committee discussions, considerable concern was expressed regarding the use of the concept of technical feasibility as the basis of ambient air standards. The Committee determined that 1) the health of people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and 2) the growth of pollution load in many areas, even with application of available technology, would still be deleterious to public health.
>
> "Therefore, the Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down . . . ." S. Rep. No. 91–1196, pp. 2–3 (1970).

The Conference Committee and, ultimately, the entire Congress accepted the Senate's three-year mandate for the achievement of primary air quality standards, and the clear import of that decision is that the Administrator must approve a plan that provides for attainment of the primary standards in three years even if attainment does not appear feasible. In rejecting the House's version of reasonableness, however, the conferees strengthened the Senate version. The Conference Committee made clear that the States could not procrastinate until the deadline approached. Rather, the primary standards had to be met in less than three years if possible; they had to be met "as expeditiously as practica-

ble." § 110 (a)(2)(A). Whatever room there is for considering claims of infeasibility in the attainment of primary standards must lie in this phrase, which is, of course, relevant only in evaluating those implementation plans that attempt to achieve the primary standard in less than three years.

It is argued that when such a state plan calls for proceeding more rapidly than economics and the available technology appear to allow, the plan must be rejected as not "practicable." Whether this is a correct reading of § 110 (a)(2)(A) depends on how that section's "as expeditiously as practicable" phrase is characterized. The Administrator's position is that § 110 (a)(2)(A) sets only a minimum standard that the States may exceed in their discretion, so that he has no power to reject an infeasible state plan that surpasses the minimum federal requirements—a plan that reflects a state decision to engage in technology forcing on its own and to proceed more expeditiously than is practicable. On the other hand, petitioner and *amici* supporting its position argue that § 110 (a)(2)(A) sets a mandatory standard that the States must meet precisely, and conclude that the Administrator may reject a plan for being too strict as well as for being too lax. Since the arguments supporting this theory are also made to show that the Administrator must reject a state plan that provides for achieving more than the secondary air quality standards require, we defer consideration of this question in order to outline the development and content of the secondary standards provision of § 110 (a)(2)(A).

Secondary air quality standards, those necessary to protect the public welfare, were subject to far less legislative debate than the primary standards. The House version of the Amendments treated welfare-related standards together with health-related standards, and

required both to be met "within a reasonable time."
H. R. 17255, 91st Cong., 2d Sess., §§ 107 (e)(1), 108 (c)
(1)(C)(i) (1970). The Senate bill, on the other hand,
treated health- and welfare-related standards separately
and did not require that welfare-related standards be met
in any particular time at all, S. 4358, 91st Cong., 2d Sess.,
§§ 110 (a)(3), 110 (b), 111 (a)(2)(A) (1970), although
the Committee Report expressed the desire that they
be met "as rapidly as possible." S. Rep. No. 91–1196,
p. 11 (1970). The final Amendments also separated
welfare-related standards from health-related standards,
labeled them secondary air quality standards, and
adopted the House's requirement that they be met
within a "reasonable time." §§ 109 (b), 110 (a)(2)(A).
Thus, technology forcing is not expressly required in
achieving standards to protect the public welfare.[6]

It does not necessarily follow, however, that the Ad-
ministrator may consider claims of impossibility in as-
sessing a state plan for achieving secondary standards.
As with plans designed to achieve primary standards in
less than three years, the scope of the Administrator's
power to reject a plan depends on whether the State it-
self may decide to engage in technology forcing and
adopt a plan more stringent than federal law demands.[7]

*Amici* Appalachian Power Co. et al. argue that the
Amendments do not give such broad power to the States.

---

[6] The Administrator appears to take this position in his guide-
lines for attaining secondary standards. See 40 CFR § 51.13 (b)
(1975).

[7] A different question would be presented if the Administrator
drafted the plan himself pursuant to § 110 (c). Cf. *District of
Columbia* v. *Train,* 172 U. S. App. D. C. 311, 521 F. 2d 971 (1975);
*South Terminal Corp.* v. *EPA,* 504 F. 2d 646 (CA1 1974). Whether
claims of economic or technical infeasibility must be considered by
the Administrator in drafting an implementation plan is a question
we do not reach.

They claim that the States are precluded from submitting implementation plans more stringent than federal law demands by § 110 (a)(2)'s second criterion—that the plan contain such control devices "as may be necessary" to achieve the primary and secondary air quality standards. § 110 (a)(2)(B).[8] The contention is that an overly restrictive plan is not "necessary" for attainment of the national standards and so must be rejected by the Administrator.[9]

The principal support for this theory of *amici* lies in the fact that while the House and Senate versions of § 110 (a)(2) both expressly provided that the States could submit for the Administrator's approval plans that were stricter than the national standards required, see H. R. 17255, 91st Cong., 2d Sess., § 108 (c) (1970); S. 4358, 91st Cong., 2d Sess., § 111 (a)(1) (1970), the section as enacted contains no such express language. *Amici* argue that the Conference Committee must have decided to require state implementation plans simply—and precisely—to meet the national standards. The argument of *amici* proves too much. A Conference Committee lacks power to make substantive changes on matters about

---

[8] See n. 1, *supra.*

[9] *Amici* not only argue that the Administrator must reject state plans that attempt to attain the primary standards more rapidly than "practicable" or the secondary standards in less than a "reasonable time," but also that he must reject state implementation plans that call for more quantitative emission controls than those necessary to meet the national primary and secondary standards. This argument adds nothing to deciding whether claims of economic or technological infeasibility can be raised. If quantitatively stiffer standards are barred, all plans containing them must be rejected, whether infeasible or not. In any case, as we make clear below, the States may adopt such more rigorous emission standards, and the Administrator must approve plans containing them if the minimum federal requirements are satisfied.

which both Houses agree. 2 U. S. C. § 190c (a) (Senate Conference Reports); Rule XXVIII (3), Rules of the House of Representatives, and § 546, Jefferson's Manual, H. R. Doc. No. 384, 92d Cong., 2d Sess., 526, 270–271 (1972); *National Coal Operators' Assn.* v. *Kleppe,* 423 U. S. 388, 401 n. 10 (1976). Here the Conference Report expressly notes that both the Senate and House bills would allow States to submit plans more stringent than the national standards demand, and offers no suggestion that the Conference bill intended to change that result, even if it could. H. R. Conf. Rep. No. 91–1783, p. 45 (1970). And while the final language of § 110 (a) (2)(B) may be less explicit than the versions originally approved by the House and the Senate, the most natural reading of the "as may be necessary" phrase in context is simply that the Administrator must assure that the minimal, or "necessary," requirements are met, not that he detect and reject any state plan more demanding than federal law requires.[10]

This reading is further supported by practical considerations. Section 116 of the Clean Air Act, as added, 84 Stat. 1689, 42 U. S. C. § 1857d–1 (1970 ed., Supp. IV), provides that the States may adopt emission standards

---

[10] Subsequent legislation confirms that this was Congress' original intent. In response to the fuel shortages of late 1973, Congress enacted the Energy Supply and Environmental Coordination Act of 1974, Pub. L. 93–319, 88 Stat. 246. The Act allows the Administrator to review state implementation plans and notify the States if their restrictions on fuel-burning stationary sources may be relaxed without interfering with timely attainment and maintenance of national air quality standards. 42 U. S. C. § 1857c–5 (3)(B) (1970 ed., Supp. IV). The decision whether to relax restrictions, however, is left to the States. The Act shows congressional awareness and approval of the fact that federally approved implementation plans may be stricter than necessary for attainment of national standards.

stricter than the national standards.[11] *Amici* argue that such standards must be adopted and enforced independently of the EPA-approved state implementation plan. This construction of §§ 110 and 116, however, would not only require the Administrator to expend considerable time and energy determining whether a state plan was precisely tailored to meet the federal standards,[12] but would simultaneously require States desiring stricter standards to enact and enforce two sets of emission standards, one federally approved plan and one stricter state plan. We find no basis in the Amendments for visiting such wasteful burdens upon the States and the Administrator, and so we reject the argument of *amici*.

We read the "as may be necessary" requirement of § 110 (a)(2)(B) to demand only that the implementation plan submitted by the State meet the "minimum conditions" of the Amendments.[13] *Train* v. *NRDC*, 421

---

[11] Section 116, 42 U. S. C. § 1857d–1 (1970 ed., Supp. IV), provides:

"Except as otherwise provided in sections 119 (c), (e), and (f), 209, 211 (c)(4), and 233 (preempting certain State regulation of moving sources) nothing in this Act shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 111 or 112, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section."

[12] This burden would be particularly onerous in view of the facts that Congress gave the Administrator only four months in which to evaluate each plan submitted, § 110 (a)(2), and that all state plans are submitted at approximately the same time. § 110 (a)(1).

[13] Economic and technological factors may be relevant in determining whether the minimum conditions are met. Thus, the Administrator may consider whether it is economically or technologically

U. S., at 71 n. 11. Beyond that, if a State makes the legislative determination that it desires a particular air quality by a certain date and that it is willing to force technology to attain it—or lose a certain industry if attainment is not possible—such a determination is fully consistent with the structure and purpose of the Amendments, and § 110 (a)(2)(B) provides no basis for the EPA Administrator to object to the determination on the ground of infeasibility.[14] See *Train* v. *NRDC, supra,* at 79.

In sum, we have concluded that claims of economic or technological infeasibility may not be considered by the Administrator in evaluating a state requirement that primary ambient air quality standards be met in the mandatory three years. And, since we further conclude that the States may submit implementation plans more stringent than federal law requires and that the Administrator must approve such plans if they meet the minimum requirements of § 110 (a)(2), it follows that the language of § 110 (a)(2)(B) provides no basis for the Administrator ever to reject a state implementation plan on the ground that it is economically or technologically infeasible. Accordingly, a court of appeals reviewing an

---

possible for the state plan to require more rapid progress than it does. If he determines that it is, he may reject the plan as not meeting the requirement that primary standards be achieved "as expeditiously as practicable" or as failing to provide for attaining secondary standards within "a reasonable time."

[14] In a literal sense, of course, no plan is infeasible since offending sources always have the option of shutting down if they cannot otherwise comply with the standard of the law. Thus, there is no need for the Administrator to reject an economically or technologically "infeasible" state plan on the ground that anticipated noncompliance will cause the State to fall short of the national standards. Sources objecting to such a state scheme must seek their relief from the State.

approved plan under § 307 (b)(1) cannot set it aside on those grounds, no matter when they are raised.

### III

Our conclusion is bolstered by recognition that the Amendments do allow claims of technological and economic infeasibility to be raised in situations where consideration of such claims will not substantially interfere with the primary congressional purpose of prompt attainment of the national air quality standards. Thus, we do not hold that claims of infeasibility are never of relevance in the formulation of an implementation plan or that sources unable to comply with emission limitations must inevitably be shut down.

Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan. So long as the national standards are met, the State may select whatever mix of control devices it desires, *Train* v. *NRDC, supra,* at 79, and industries with particular economic or technological problems may seek special treatment in the plan itself. Cf. 40 CFR §§ 51.2 (b), (d) (1975); S. Rep. No. 91–1196, p. 36 (1970). Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance, as petitioner did in this case; and the variance, if granted after notice and a hearing, may be submitted to the EPA as a revision of the plan.[15] § 110 (a)(3)(A), as amended, 88 Stat. 256, 42 U. S. C. § 1857c–5 (a)(3)(A) (1970 ed., Supp. IV). Lastly, an industry denied an exemption from the implementation plan, or denied a subsequent variance, may be able to take its claims of

---

[15] A variance approved as a revision of a plan under § 110 (a)(3) (A) will be honored by the EPA as part of an applicable implementation plan, § 110 (d), a matter of no little import to those granted variances. See n. 3, *supra.*

economic or technological infeasibility to the state courts. See, *e. g.*, Mo. Rev. Stat. § 203.130 (1972); Cal. Health & Safety Code § 39506 (West 1973); Pa. Stat. Ann., Tit. 71, § 1710.41 (1962).[16]

While the State has virtually absolute power in allocating emission limitations so long as the national standards are met, if the state plan cannot meet the national standards, the EPA is implicated in any postponement procedure. There are two ways that a State can secure relief from the EPA for individual emission sources, or classes of sources, that cannot meet the national standards. First, if the Governor of the State so requests at the time the original implementation plan is submitted, and if the State provides reasonable interim controls, the Administrator may allow a two-year extension of the three-year deadline for attainment of primary air quality standards if he finds, *inter alia,* that it is technologically infeasible for the source to comply. § 110 (e).[17] Second, again upon application of the Governor of the State, the Administrator may allow a one-year postponement of any compliance date in an implementation plan if he finds, *inter alia,* that compliance is technologically

---

[16] Of course, the Amendments do not *require* the States to formulate their implementation plans with deference to claims of technological or economic infeasibility, to grant variances on those or any other grounds, or to provide judicial review of such actions. Consistent with Congress' recognition of the primary role of the States in controlling air pollution, the Amendments leave all such decisions to the States, which have typically responded in the manner described in the text. Cf. 40 CFR §§ 51.2 (b), (d) (1975).

[17] Section 110 (e) itself convincingly demonstrates that the statutory scheme did not contemplate the Administrator's rejecting state implementation plans as infeasible. There would be little purpose in providing noncomplying sources with § 110 (e)'s limited mechanism for postponing infeasible plans—dependent upon the cooperation of the State—if the sources had the option of going to court instead and freeing themselves entirely of the plan by having it struck down as infeasible.

infeasible and that "the continued operation of [the emission source] is essential to national security or to the public health or welfare . . . ." § 110 (f). See *Train* v. *NRDC*, 421 U. S., at 81.

Even if the State does not intervene on behalf of an emission source, technological and economic factors may be considered in at least one other circumstance. When a source is found to be in violation of the state implementation plan, the Administrator may, after a conference with the operator, issue a compliance order rather than seek civil or criminal enforcement. Such an order must specify a "reasonable" time for compliance with the relevant standard, taking into account the seriousness of the violation and "any good faith efforts to comply with applicable requirements." § 113 (a)(4) of the Clean Air Act, as added, 84 Stat. 1686, 42 U. S. C. § 1857c–8 (a)(4). Claims of technological or economic infeasibility, the Administrator agrees, are relevant to fashioning an appropriate compliance order under § 113 (a)(4). Brief for Respondent EPA 36 n. 34.[18]

In short, the Amendments offer ample opportunity for consideration of claims of technological and economic infeasibility. Always, however, care is taken that consideration of such claims will not interfere substantially with the primary goal of prompt attainment of the national standards. Allowing such claims to be raised by

---

[18] If he chooses not to seek a compliance order, or if an order is issued and violated, the Administrator may institute a civil enforcement proceeding. § 113 (b). Additionally, violators of an implementation plan are subject to criminal penalties under § 113 (c) and citizen enforcement suits under § 304, as added, 84 Stat. 1706, 42 U. S. C. § 1857h–2. Some courts have suggested that in criminal or civil enforcement proceedings the violator may in certain circumstances raise a defense of economic or technological infeasibility. See *Buckeye Power, Inc.* v. *EPA*, 481 F. 2d 162, 173 (CA6 1973); *Indiana & Michigan Electric Co.* v. *EPA*, 509 F. 2d 839, 847 (CA7 1975). We do not address this question here.

appealing the Administrator's approval of an implementation plan, as petitioner suggests, would frustrate congressional intent. It would permit a proposed plan to be struck down as infeasible before it is given a chance to work, even though Congress clearly contemplated that some plans would be infeasible when proposed. And it would permit the Administrator or a federal court to reject a State's legislative choices in regulating air pollution, even though Congress plainly left with the States, so long as the national standards were met, the power to determine which sources would be burdened by regulation and to what extent. Technology forcing is a concept somewhat new to our national experience and it necessarily entails certain risks. But Congress considered those risks in passing the 1970 Amendments and decided that the dangers posed by uncontrolled air pollution made them worth taking. Petitioner's theory would render that considered legislative judgment a nullity, and that is a result we refuse to reach.[19]

*Affirmed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring.

I join the opinion of the Court because the statutory scheme and the legislative history, thoroughly described in the Court's opinion, demonstrate irrefutably that Congress did not intend to permit the Administrator of

---

[19] Petitioner has briefed its contention that the Due Process Clause of the Fifth Amendment demands that at some time it be afforded the opportunity to raise before a court claims of economic and technological impossibility. This claim was neither presented to, nor considered by, the Court of Appeals, and we declined to grant certiorari on the question. 423 U. S. 821 (1975). In any case, we could not resolve petitioner's claim here, for there has been no showing that a § 307 (b) (1) appeal would be the only opportunity for petitioner to raise before a court its claims of economic and technological impossibility.

the Environmental Protection Agency to reject a proposed state implementation plan on the grounds of economic or technological infeasibility. Congress adopted this position despite its apparent awareness that in some cases existing sources that cannot meet the standard of the law must be closed down.[1]

The desire to impose strong incentives on industry to encourage the rapid development and adoption of pollution control devices is understandable. But it is difficult to believe that Congress would adhere to its absolute position if faced with the potentially devastating consequences to the public that this case vividly demonstrates.

Petitioner is an electric utility supplying power demands in the St. Louis metropolitan area, a large part of Missouri, and parts of Illinois and Iowa. It alleges that it cannot continue to operate if forced to comply with the sulfur dioxide restrictions contained in the

---

[1] The record is clear beyond question that at least the sponsors and floor leaders of the Clean Air Act intended that industries unable to comply with approved state implementation plans, whether because of economic or technological infeasibility, would be "closed down." This is explicit in the Senate Report. S. Rep. No. 91–1196, p. 3 (1970). It is repeated quite candidly in the statements of various members of the Senate and is described in detail in the EPA's brief in this case. Brief for Respondent EPA 20–32. Indeed, remarkable as it may seem, it is clear from the legislative history that even total technological infeasibility is "irrelevant." See id., at 16, 18–23.

What this means in this case, if the allegations of Union Electric Co. prove to be correct, is that—in the interest of public health—the utility will be ordered to discontinue electric service to the public. As one cannot believe this would be allowed, I suppose that the State or Federal Government would find some basis for continuing to operate the company's facilities to serve the public despite noncompliance. But no such contingency program or authority therefor is found in the statute, and we must decide the case on the record before us.

Missouri implementation plan approved by the Administrator. Specifically, petitioner alleges that since the Administrator's approval of the plan, low-sulfur coal has become too scarce and expensive to obtain; reliable and satisfactory sulfur dioxide removal equipment that would enable it to comply with the plan's requirements simply has not been devised; the installation of the unsatisfactory equipment that is available would cost over $500 million, a sum impossible to obtain by bonds that are contingent on approval by regulatory bodies and public acceptance; and, even if the financing could be obtained, the carrying, operating, and maintenance costs of over $120 million a year would be prohibitive.[2] Petitioner further alleges that recent evidence has disclosed that sulfur dioxide in the ambient air is not the hazard to public health that it was once thought to be, and that compliance with the sulfur regulation in the Missouri plan is not necessary to the attainment of national primary and secondary ambient air standards in the St. Louis area.

At the risk of civil and criminal penalties enforceable by both the State and Federal Governments, as well as possible citizens' suits, 42 U. S. C. §§ 1857c–8, 1857h–2, petitioner is being required either to embark upon the task of installing allegedly unreliable and prohibitively expensive equipment or to shut down. Yet the present Act permits neither the Administrator, in approving the state plan, nor the courts, in reviewing that approval under § 307 of the Act, 42 U. S. C. § 1857h–5, even to consider petitioner's allegations of infeasibility.

Environmental concerns, long neglected, merit high priority, and Congress properly has made protection of

---

[2] The burden of these extraordinary capital and operating costs, even if the technological infeasibility problems could be solved, would fall necessarily on the consumers of electric power.

the public health its paramount consideration. See S.
Rep. No. 91–1196, pp. 2–3 (1970). But the shutdown
of an urban area's electrical service could have an even
more serious impact on the health of the public than
that created by a decline in ambient air quality. The
result apparently required by this legislation in its pres-
ent form could sacrifice the well-being of a large metro-
politan area through the imposition of inflexible demands
that may be technologically impossible to meet and in-
deed may no longer even be necessary to the attainment
of the goal of clean air.

I believe that Congress, if fully aware of this Draconian
possibility, would strike a different balance.