**MANATEE COUNTY, FLORIDA, Plaintiff-Appellee,**

v.

**Russell E. TRAIN, as Administrator of the United States Environmental Protection Agency, Defendant-Appellant.**

**No. 76–4115.**

United States Court of Appeals, Fifth Circuit.

Nov. 3, 1978.

---

John L. Briggs, U. S. Atty., Jacksonville, Fla., Eleanore J. Hill, Asst. U. S. Atty., Tampa, Fla., Paul M. Kaplow, Atty, Dept. of Justice, Washington, D. C., Frances E. Phillips, Regional Counsel, Environmental Protection Agency, Atlanta, Ga., Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Carl Strass, Land & Nat. Res. Div., Dept. of Justice, App. Sect., Washington, D. C., for defendant-appellant.

Paul E. Logan, Warren M. Goodrich, Bradenton, Fla., for plaintiff-appellee.

Before RONEY, TJOFLAT and HILL, Circuit Judges.

RONEY, Circuit Judge:

In April 1971, plaintiff Manatee County, Florida, was awarded a federal grant of 33% of the cost of construction of a sewage treatment plant. In 1972, a statutory amendment increased the possible federal participation to 75% of the cost, conditioned on a state board certification as to need. The sole issue in this case of first impression is whether a district court may properly order the Administrator of the Environmental Protection Agency to pay the increase from 33% to 75% on the basis of a state board certificate which, though regular on its face, is considered to be wrong by the Administrator.

In this case, the district court ruled that if the state board certifies in the statutory language, the Administrator is powerless under the law to challenge the correctness of the certification. We affirm.

In 1971 Manatee County applied for a federal grant for sewage treatment works construction under the Federal Water Pollution Control Act. In April of 1971 the application was approved for a grant of 33% of the cost of construction, in accordance with the then extant provision of the statute governing the federal share, 33 U.S.C. § 1158 (1970).

Thereafter, in 1972, the Act was amended by the Federal Water Pollution Control Act Amendments of 1972 [Pub.L. No. 92–500, 86 Stat. 816, 33 U.S.C. §§ 1251 et seq. (Supp. II 1972)]. Subsection 202(a) of the 1972

Amendments [33 U.S.C. § 1282(a) (Supp. II 1972)] provided that the federal share of all subsequent grants would be 75%. Subsection 202(b) [33 U.S.C. § 1282(b) (Supp. II 1972)], directly involved in this appeal, provided that a specified class of grants made prior to July 1, 1971 could be increased to 75%.

Since the Federal Water Pollution Control Act has been further amended by the Clean Water Act of 1977 [Pub.L. No. 95–217, 91 Stat. 1611, codified at 33 U.S.C.A. §§ 1251 *et seq.* (Supp.1978)], we have set out in the notes the language of § 1282(a) [1] and § 1282(b) [2] prior to the 1977 Amendments. All references in this opinion are to the Act as it appeared in 33 U.S.C. §§ 1251 *et seq.* (Supp. II 1972) at the time suit was brought; references to the Act as amended in 1977 and currently in force are clearly noted as such and are cited to U.S.C.A.

Manatee County's grant fell within the class of grants eligible for increase to 75%. Therefore, Manatee County requested that its grant be increased to 75% under the provisions of § 1282(b). This section provided that grants such as Manatee's approved after January 1, 1971 and before

July 1, 1971, "*shall,* upon the request of the applicant, be increased" to 75%, if two conditions are met, only the second of which is contested here. That condition requires a State water pollution control agency certificate that the quantity of available ground water will be insufficient without the project. In support of its request, Manatee County submitted the certification of the Florida Pollution Control Board, which had held hearings and certified in the statutory language that

> The quantity of available ground water is and will be insufficient, inadequate, or unsuitable for public use, including the ecological preservation and recreational use of surface water bodies, unless publicly owned treatment works return effluents to the ground after adequate treatment in Manatee County.

The EPA rejected the request. It concedes that all other requirements and conditions have been met, and that the appropriate state agency has certified in the statutory language of § 1282(b)(2). It also concedes that the action of the Florida Board was duly and regularly taken, and that the certification was not fraudulent or criminal.

---

1. Section 202(a) of the 1972 Amendments, 33 U.S.C. § 1282(a) (Supp. II 1972), provides:

    (a) The amount of any grant for treatment works made under this chapter from funds authorized for any fiscal year beginning after June 30, 1971, *shall* be 75 per centum of the cost of construction thereof (as approved by the Administrator). Any grant (other than for reimbursement) made prior to October 18, 1972, from any funds authorized for any fiscal year beginning after June 30, 1971, *shall* upon the request of the applicant, be increased to the applicable percentage under this section.
    (emphasis added).

2. Section 202(b) of the 1972 Amendments, 33 U.S.C. § 1282(b) (Supp. II 1972), provides:

    (b) The amount of the grant for any project approved by the Administrator after January 1, 1971, and before July 1, 1971, for the construction of treatment works, the actual erection, building or acquisition of which was not commenced prior to July 1, 1971, *shall,* upon the request of the applicant, be increased to the applicable percentage under subsection (a) of this section for grants for treatment works from funds for fiscal years beginning after June 30, 1971, with respect to the cost of such actual erection, building, or

acquisition. Such increased amount shall be paid from any funds allocated to the State in which the treatment works is located without regard to the fiscal year for which such funds were authorized. *Such increased amount shall be paid for such project only if—*
    (1) a sewage collection system that is a part of the same total waste treatment system as the treatment works for which such grant was approved is under construction or is to be constructed for use in conjunction with such treatment works, and if the cost of such sewage collection system exceeds the cost of such treatment works, and
    (2) *the State water pollution control agency* or other appropriate State authority *certifies that the quantity of available ground water will be insufficient,* inadequate, or unsuitable for public use, including the ecological preservation and recreational use of surface water bodies, unless effluents from publicly-owned treatment works after adequate treatment are returned to the ground water consistent with acceptable technological standards.
    (emphasis added).

It explained to Manatee County, however, that on the basis of analyses by the EPA's experts, it had concluded that the quantity of available ground water was not insufficient, and that because of certain geological conditions in Florida, the project could not possibly improve ground water.

Manatee County then brought the present action in the nature of mandamus in the district court. Both parties moved for summary judgment. The district court denied the Government's summary judgment motion and granted summary judgment for Manatee County, citing *Union Electric Co. v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).

■ Congress provided in § 1282(b) that the EPA *"shall"* increase project grants to 75% if two conditions are met. "Use of the word 'shall' generally indicates a mandatory intent unless a convincing argument to the contrary is made." *Sierra Club v. Train*, 557 F.2d 485, 489 (5th Cir. 1977). *See generally*, 73 Am.Jur.2d *Statutes* §§ 22–25 (1974). It is necessary to look to the wording of a statute, its purposes, and its legislative history to see if any contrary intent is to be found. In the present case, not only is there no indication to the contrary, but the indications show that Congress did intend this to be a mandatory duty.

Looking to the specific language employed in Subchapter II of the Act, "Grants for Construction of Treatment Works," 33 U.S.C. §§ 1281–1292 (Supp. II 1972), it is at once apparent that Congress knew the difference between mandatory and discretionary language. Where Congress wanted to give discretion to the Administrator of the EPA, Congress employed the term "is authorized." For example, the basic granting provision provides that

> The Administrator *is authorized* to make grants to any State, municipality, or intermunicipal or interstate agency for the construction of publicly owned treatment works.

33 U.S.C. § 1281(g)(1) (Supp. II 1972) (emphasis added). The "is authorized" language is employed many times in Subchapter II where the Administrator is to have discretion. *See* 33 U.S.C. §§ 1281(g)(4), 1283(e), 1288(g) (Supp. II 1972). The 1977 Amendments also frequently used the "is authorized" language to give discretionary power. *See* U.S.C.A. §§ 1281(j), 1282(a)(3), 1284(b)(6), 1285(g)(1), 1285(g)(2) (Supp. 1978).

■ In addition, the 1977 Amendments use the term "may" in several sections where discretion is to be employed. *See* 33 U.S.C.A. §§ 1281(h), 1283(a), 1284(b)(3), 1284(b)(5), 1285(g)(2), 1285(h) (Supp.1978). The fact that in the 1977 Amendments Congress distinguished "shall" from "may" shows that in Subchapter II of the Act, Congress used "shall" in its everyday sense, as imposing a mandatory duty on the Administrator. *See Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975) (holding that the use of the word "shall" in § 1285(a) of Subchapter II of the Act imposes a mandatory duty on the Administrator to allot all the amounts authorized to be appropriated).

This conclusion is reinforced by the structure of the Act. Congress intended for the states to have the primary responsibility for planning their construction projects. This was made even clearer by the 1977 Amendments to the Act, which amended the Act's general declaration of congressional goals and policy, adding the italicized language, to provide:

> (b) It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. *It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title.* It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal techni-

cal services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

33 U.S.C.A. § 1251(b) (Supp.1978). Congress has often followed this policy of giving primary responsibility to the states and only a secondary role to the EPA when dealing with environmental problems. For example, in construing certain provisions of the Clean Air Amendments of 1970, the Supreme Court stated:

> The Agency [EPA] is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met. Under § 110(a)(2), the Agency is *required* to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, and which also satisfies that section's other general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards. § 110(c). Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.

*Train v. Natural Resources Defense Council,* 421 U.S. 60, 79, 95 S.Ct. 1470, 1482, 43 L.Ed.2d 731 (1975) (footnote omitted, emphasis in original).

■ This does not mean that any project a state wants funded will be federally funded. Rather, § 1281(g)(1) says that the Administrator "is authorized" to make grants for construction of publicly owned treatment works. Section 1283(a) requires applicants for a grant to submit plans "to the Administrator for his approval," and § 1284 details the factors which the Administrator is to examine before approving the project. Thus, the Administrator has some discretion in initially approving a state project. It is at this stage that the EPA should prevent projects that are "impossible" or are otherwise inconsistent with the Act's purpose of improving water quality.

Once the Administrator approves the project, however, the percentage amount of the federal share is set by law, without any discretion left in the Administrator. Before the 1972 Amendments, the federal share was set at 33%. The 1972 Amendments increased the federal share for all new projects to 75% automatically without giving the EPA any discretion. For certain interim projects, Congress provided that the federal share would be increased to 75% at the request of the applicant. And for those interim projects approved before July 1, 1971, Congress provided for an increase to 75% if it was a § 1282(b)(1) type project and if the appropriate state agency certified to certain conditions. Thus, the EPA cannot go behind the state certificate because it differs with the state or even because it decides the project as certified by the state agency is "impossible." Congress delegated this decision to the state agency, not the EPA. It did not require the state agency's decision to meet with the EPA's approval, as it did in certain other situations. *Compare* 33 U.S.C. §§ 1281(g)(3), 1281(g)(5), 1281(g)(6), 1283(a), 1286(f)(1) (Supp. II 1972) (all requiring the state to make showings "to the satisfaction of the Administrator" or giving the EPA authority to approve of state decisions).

■ We conclude that "shall" is used in § 1282(b) in the mandatory sense. The EPA, therefore, *must* increase Manatee County's federal grant to 75% because the two conditions imposed by §§ 1282(b)(1) and (2) are met. The EPA's belief that the state certification is unwise or even that it is impossible for the project to improve ground water is irrelevant and may not be

considered. *See Union Electric Co. v. EPA,* 427 U.S. 246, 257, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976) (since the Clean Water Act provides that the EPA shall approve a plan if it meets eight specified criteria, use of the "mandatory 'shall' makes it quite clear that the Administrator is not to be concerned with factors other than those specified, . . . and none of the eight factors appears to permit consideration of technological or economic infeasibility.").

Accordingly, the district court correctly ordered the EPA to increase Manatee County's federal grant to 75% of the project's cost of construction.

AFFIRMED.

JAMES C. HILL, Circuit Judge, specially concurring.

I concur in the opinion prepared for us by Judge Roney and in the result reached. I am persuaded, however, that these additional remarks are pertinent.

We have, today, decided this case by an even-handed application of the law, as enacted by the Congress, to the material facts which are not in dispute. The dispute revealed in the record is not pertinent to our judicial function. The Administrator's contentions question the wisdom of the law insofar as it leaves it to a sovereign state to act responsibly towards the taxpayers of the entire nation. The Administrator asserts that the state board has irresponsibly granted a certificate, certifying to an absurdity, in order to divert the funds of the country's taxpayers to payment for an improved facility in that state.

Finding that, under 33 U.S.C. § 1282(b), the state board's certificate is controlling, we do not address and we do not decide whether or not the Administrator's charges have any merit. Those assertions test the wisdom of the Congress in having given the state important rights, and corresponding duties, in determining whether or not a state project is entitled to a higher share of federal taxpayer's money. If, as the federal party suggests, the state board will not act responsibly in the face of such a provincial temptation, the Congress may be compelled to retreat from granting local rights and repair to more centralized federal control. That will be determined by what the Congress perceives to be the degree of responsibility displayed by the states.

With the helpful counsel of able attorneys, we have found and applied the law. If that law be unwise, as to which we express no opinion, we have every confidence that those who work under Article I of the Constitution will deal further with the matter.