

Villanova University School of Law

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-3-1999

# Duquesne Light Co v. EPA

Precedential or Non-Precedential:

Docket 98-3071

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Duquesne Light Co v. EPA" (1999). *1999 Decisions.* Paper 28.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/28

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 3, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-3071

DUQUESNE LIGHT CO.,
        Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,
        Respondent

COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
        Intervenor-Respondent

On Petition for Review of
Environmental Protection Agency

Submitted Under Third Circuit LAR 34.1(a)
January 25, 1999

Before: SLOVITER, McKEE and RENDELL, Circuit Judges

(Filed February 3, 1999)

        John P. Proctor
        Margaret A. Hill
        Andrew H. Leskovsek
        Washington, D.C. 20005

         Attorneys for Petitioner

Lois J. Scuiffer
Assistant Attorney General
Environmental Defense Section

Stephen R. Herm
United States Department of Justice
Environmental Defense Section
Washington, D.C. 20026

 Attorneys for Respondent

Paul A. Tufano
Terry R. Bossert
M. Dukes Pepper, Jr.
Joyce E. Epps
Commonwealth of Pennsylvania
 Department of Environmental
 Protection

 Attorneys for Intervenor-
 Respondent

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Before us is a Petition for Review filed by Duquesne Light Company, a Pennsylvania investor-owned electric utility in the Greater Pittsburgh area ("Duquesne"), of afinal rule of the United States Environmental Protection Agency ("EPA") approving, pursuant to section 110 of the Clean Air Act, 42 U.S.C. S 7410, a revision to the New Source Review of the State Implementation Plan of the Commonwealth of Pennsylvania. We have jurisdiction to review suchfinal agency actions pursuant to section 307(b) of the Clean Air Act, 42 U.S.C. S 7607(b).

EPA argues first that Duquesne lacks both constitutional and prudential standing. This is an issue that we must address at the outset. See Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1012-13 (1998). However, to understand EPA's contention that Duquesne cannot meet

2

the causation and redressability requirements for standing, it is necessary to understand the statutory framework.

Under the Clean Air Act, EPA has the obligation to establish national ambient air quality standards ("NAAQS") for certain pollutants. Because the Act establishes a joint federal and state program to control air pollution and to protect public health, the states are required to prepare implementation plans, or SIPs, for each designated "air quality control region" within their borders. 42 U.S.C. S 7410. The SIP must specify emission limitations and other measures necessary for that region to meet and maintain the required NAAQS. Id. S 7410(a)(2)(A)-(K). Each SIP must be submitted to EPA for its review and approval. The Act requires a public notice and comment period, and the SIP must be approved if it is found to meet the minimum requirements of the Clean Air Act. 42 U.S.C. S 7410(k)(3); see also Union Elec. Co. v. EPA, 427 U.S. 246, 265 (1976). The Clean Air Act expressly provides that the states may adopt more stringent air pollution control measures than the Act requires with or without EPA approval. See 42 U.S.C. S 7410(k)(3).

In 1990, the Clean Air Act was amended to address the failure of some states to meet their required NAAQS. Pursuant to the 1990 Amendments, all SIPS must contain a New Source Review program, which establishes procedures for state regulation of proposed new sources of pollutants. Id. S 7410(a)(2)(C). Further, New Source Review programs for what the EPA characterizes as "nonattainment" regions must require that the entities seeking to construct new major sources of regulated pollutants, or to make significant modifications to such existing sources, must obtain a preconstruction permit obligating them to obtain "sufficient offsetting emissions reductions" so as to represent "reasonable further progress towards attainment." Id. S 7503(a)(1)(A).

EPA has promulgated regulations regarding minimum criteria for EPA approval of New Source Review SIPs for nonattainment areas which contain a number of definitions which must be used by the states for this purpose. However, the EPA regulations also provide that a state may deviate from those definitions "only if the state specifically

3

demonstrates that the submitted [state] definition is more stringent, or at least as stringent, in all respects as the corresponding [federal] definition . . . ." 40 C.F.R. S 51.165(a)(1).

Duquesne has a non-operational electric generating station currently in cold- reserve status which it hopes to use to generate Emission Reduction Credits ("ERCs"). ERCs are recognized by the regulatory agencies as reductions in pollutants. ERCs are determined as the difference between (1) emissions after an entity's action (e.g., shut ting down or modernizing polluting equipment) and (2) a baselin e of prior "actual emissions." Although ERCs are initially assigned to the entity responsible for the reduction, they may be bought and sold. Apparently, it is Duquesne's interest in preserving ERCs from its dormant plant that is the basis for its challenge to the SIP revision.

The SIP revision to which Duquesne objects relates to the definition of "actual emissions," which, as noted, form the baseline for the determination of ERCs. EPA regulations define "actual emissions" as generally equaling the average rate at which the source "actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. S 51.165(a)(1)(xii)(B). They further provide that "[t]he reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation." Id.

The Pennsylvania New Source Review program at issue, adopted in January 1994, effects what Duquesne terms a de facto definition of the term "actual emissions," and what EPA prefers to refer to as "Pennsylvania's definition." In any event, Pennsylvania provides that "actual emissions or allowable emissions, whichever is lower, shall be calculated over the 2 calendar years immediately preceding the emissions reduction which generates the ERCs," 25 Pa. Code S 127.207(4)(i)(A), thus mirroring the federal scheme. Pennsylvania further provides, however, that should the reviewing agency determine that the period immediately preceding is "not representative of the normal emission rates or characteristics of the existing facility," it may specify a different, more representative, 2-year period

4

occurring within the preceding 5 calendar years. Id.
S 127.207(4)(i)(B). Unlike the federal definition, this
definition limits the "look-back" period.

In February 1994, the Pennsylvania Department of
Environmental Protection ("PDEP") submitted the New
Source Review regulations to EPA as revisions to the
Pennsylvania SIP. EPA's notice of proposed rulemaking to
grant limited approval was published in May 1997. During
the public comment period, Duquesne complained that
what it described as Pennsylvania's "de facto" definition of
actual emissions was more stringent than the federal
definition. It also complained that (1) contrary  to its own
regulations, EPA had not required Pennsylvania to
demonstrate the definition's stringency, and (2)  the
Pennsylvania Air Pollution Control Act prohibited PDEP
from promulgating a more stringent Clean Air Act-related
rule. EPA responded that applicable federal regulations
permit more stringent state requirements and that, because
the Pennsylvania Environmental Quality Board expressly
found the New Source Review rules necessary to achieve or
maintain NAAQS, state law authorized the adoption of rules
more stringent than the federal minimum.[1]  Duquesne
alleges in its Petition for Review that (1) EPA ac ted
arbitrarily, capriciously, and contrary to law in approving
Pennsylvania's definition of "actual emissions" without
requiring a demonstration of stringency, and (2)  EPA
violated the Administrative Procedure Act in failing to
respond reasonably to Duquesne's comments regarding the
Pennsylvania definition.

With this background before us, we turn to consider
Duquesne's standing. The constitutional standing inquiry
requires a three-fold showing: the party asserting
jurisdiction must demonstrate (1) an "injury in  fact,"
(2) that the injury is "fairly traceable" to  the action or
actions complained of, and (3) that the injury wil l likely be
redressed by a favorable decision. Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560-561 (1992).
_____

1. Duquesne has filed a request for administrative reconsideration of
EPA's final approval of the revised SIP. This request, which is pending,
does not affect the finality of the action for purposes of judicial
review.
See 42 U.S.C. S 7607(b).

5

There is no serious question with respect to Duquesne's injury-in-fact. Duquesne has come to court complaining that it will lose ERCs as a result of the EPAs approval of the PDEP's action. These ERCs are of tangible value to Duquesne; they would permit Duquesne to operate less expensively, and they are even fungible. Hence, Duquesne has met the first requirement for standing, inasmuch as the loss of valuable credits constitutes an imminent concrete injury.

Duquesne's claim to jurisdiction, however, founders on the other two prongs of the standing test: causation and redressability. The causation requirement is only satisfied where the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Bennett v. Spear, 520 U.S. 154, 167 (1997). In this case, Duquesne's injury is manifestly the product of the independent action of a third party -- Pennsylvania's Department of Environmental Protection. It is PDEP's action -- redefining the SIP in such a way that Duquesne may not receive ERCs for its dormant plant -- that results in the reduction of credits below the level that Duquesne urges would be the result if the Pennsylvania definition did not go beyond the minimum level of stringency required by federal law.

However, the EPA, whose action in approving the plan forms the asserted basis for federal jurisdiction here, only has power to disallow state plans that fail to be stringent enough -- that is, plans that fall below the level of stringency provided by federal law. See 42 U.S.C. S 7416 ("[N]othing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respectin g control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan . . . such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section."). EPA thus has no power to require Pennsylvania to make its plan the same as the federal requirement, provided Pennsylvania's is more

6

stringent than required by the Clean Air Act; rather, EPA by statutory directive must approve a plan when it conforms to the federal minimum. See 42 U.S.C. S 7410(k)(3) ("[T]he Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter."). Therefore, the EPA's action in approving the plan is not "fairly traceable" to the injury of which Duquesne complains.

For similar reasons, Duquesne's claim against the EPA fails the redressability requirement. To be "redressable" for standing purposes, it must "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Bennett, 117 S. Ct. at 1163. It is Duquesne's hope that it can have this action set aside by the EPA on the ground that its stringency -- required to be at or above the level mandated by federal law -- was not sufficiently addressed by the EPA. But again, as the foregoing demonstrates, EPA may not require less stringency-- which is the outcome Duquesne hopes to achieve -- in its review of whether the definition is adequately stringent. And, it should be added, Duquesne does not argue that the PDEP's definition is insufficiently stringent; in fact, Duquesne stated in its comments on the EPA's proposed approval of the Pennsylvania New Source Review SIP that, "PA DEP's approach is, in effect, more stringent than EPA's definitions." App. at 718.

Consequently, Duquesne cannot through this action secure an order from EPA or this court requiring PDEP to make its requirements more lax. Rather, what Duquesne seeks is to compel EPA to engage in a formalistic exercise by conducting a fuller demonstration of the stringency of PDEP's definition. Such a "demonstration" would be a technical formality as the stringency of that definition is not only apparent on the face of the definition, but also conceded by Duquesne. At best, if Duquesne were successful in this court, it would get a second opportunity to convince PDEP that its definition is too strict, an exercise that is wholly inconsistent with the asserted ground for maintaining that the regulation was improperly approved by EPA. Such a speculative contingency cannot support Article III standing.

7

Accordingly, we will dismiss this Petition for Review for lack of standing.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

8