CONSOLIDATION COAL COMPANY,
Plaintiff,

v.

Douglas M. COSTLE, Administrator of the Environmental Protection Agency, and the United States Environmental Protection Agency, Defendants.

No. C–2–79–294.

United States District Court,
S. D. Ohio, E. D.

Oct. 3, 1979.

---

Daniel E. Rogers, Pittsburgh, Pa., John W. Edwards, Columbus, Ohio, Anthony J. Polito, Lawrence A. Demase, Ronald S. Cusano, Pittsburgh, Pa., for plaintiff.

Matthew B. Van Hook, U.S. Environmental Protection Agency, Washington, D. C., Paul M. Kaplow, Stephen D. Ramsey, Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

This is an action brought by Consolidation Coal Company (hereafter Consol) against the United States Environmental Protection Agency (hereafter EPA) and its Administrator, Douglas M. Costle, challenging the agency's action under the Clean Air Act, 42 U.S.C. § 7401, et seq. The matter is presently before the Court on plaintiff's motion for a preliminary injunction. For the reasons stated below, I conclude that plaintiff's motion should be denied.

### I. Statutory Background and Statement of the Case

The Clean Air Act requires the EPA Administrator to publish regulations prescribing, inter alia, national primary ambient air quality standards for certain air pollutants. 42 U.S.C. § 7409(a)(1)(A). The primary standards define the maximum level of a pollutant per cubic meter of air which the Administrator judges is permissible to protect the public health. 42 U.S.C. § 7409(b)(1); 40 C.F.R. § 50.2.

This case is complicated by the fact that the standards are to be based on "criteria" which are also required to be developed and issued by the Administrator. 42 U.S.C. §§ 7408, 7409. Before a standard for a particular pollutant may be promulgated, the Administrator must first issue "air quality criteria" for that pollutant, which "accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air," and which include information of variables which may alter the effects of the pollutant on the public health and welfare and the existence of other pollutants which may interact with the pollutant to produce adverse health effects. 42 U.S.C. § 7408(a)(2). About ten years ago, the EPA issued criteria for several air pollutants in the form of volumes referred to as criteria documents.[1]

The Administrator is required periodically to review and revise the criteria documents pursuant to 42 U.S.C. § 7408(c):

(c) The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria . . . issued pursuant to this section.

This litigation focuses on the criteria document for sulfur oxides. The existing standards for sulfur dioxide were set in 1971, based on criteria promulgated in 1969. Plaintiff mines and sells coal used to generate electricity in several states including Ohio. The burning of coal emits sulfur dioxide into the ambient air. Under regulations promulgated by the defendants, utilities who purchase coal from Consol are required to reduce emissions of sulfur dioxide based on the national air quality standards for that pollutant.

---

1. Some of these criteria documents and standards have been revised since that time. At the present time there exist criteria documents and standards for the following classes of pollutants: sulfur oxides, particulates, carbon monoxide, photochemical oxidants, hydrocarbons, and nitrogen dioxide. 40 C.F.R. §§ 50.4–50.11.

Consol believes that more recent scientific data indicate that the existing standards are too stringent, and that a review and revision of the criteria on which the standards are based would result in a liberalization of the standards. The criteria also form the basis for state plans which, the plaintiff believes, are therefore similarly unsupported by scientific evidence. In the meantime, Consol is losing coal sales and customers because the coal it mines has a sulfur content too high to satisfy the existing limitation without costly emission reduction equipment.

Plaintiff contends that the sulfur oxides criteria document issued in 1969 no longer "accurately reflect[s] the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of [sulfur oxides] in the ambient air."

The EPA began a thorough process of reviewing the criteria in the summer of 1978. On January 17, 1979, plaintiff petitioned the Administrator for expedited review. The Administrator declined to do so; instead, he informed Consol of his planned schedule, which contemplates the issuance of proposed revisions of existing sulfur oxides criteria in October 1979 and of final revised criteria by December 31, 1980. Meanwhile, Consol contends, the deadline for operators to attain emission levels based on current national standards is set for October 19, 1979.

Consol has already lost several of its former Ohio utility customers and contends that others will cancel their contracts for its coal by October 19 in order to comply with the standards unless the criteria are revised before that date or the compliance date itself is suspended pending the reissuance of the criteria.

Accordingly, in its complaint, Consol requested two forms of relief. First, it requested this Court to order defendants to expedite the review and revision of the criteria for sulfur dioxide so that this process would be completed on or before the compliance date. Second, plaintiff requested this Court to enjoin the defendants from taking action under any statute, rule or regulation, including the Ohio plan, to secure compliance with any standard based on the 1969 criteria.

The grounds for its complaint are that the Administrator's failure to more expeditiously perform the required review and revision of the criteria is a violation of sections 7408 and 7409 of the Act (requiring periodic review and revision and requiring the criteria to reflect the latest scientific knowledge) and a violation of several constitutional guarantees.

## II. *Issues Presented*

In ruling on defendants' motion to dismiss, the Court examined its jurisdiction over the claims asserted and the relief requested and determined that its jurisdiction to hear plaintiff's claims is limited to a very narrow issue.

First, the Court determined that it was without jurisdiction to grant any relief regarding the enforcement of existing standards, since its jurisdiction in that respect is expressly precluded by § 307 of the Act, 42 U.S.C. § 7607.[2]

---

2. 42 U.S.C. § 7607(b)(1) and (2) is as follows:

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title, any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title) any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412(c) of this title, under section 7413(d) of this title, under section 7419 of this title, or under section 7420

As to the request for relief in the form of an order compelling the Administrator to perform his duty to review and revise the criteria document, the Court noted that were the Administrator's duty to revise and reissue the document nondiscretionary, it would have jurisdiction to order the performance of the duty under 42 U.S.C. § 7604.[3] The Court held, however, that the statute vests in the Administrator a certain degree of discretion to determine *when* the review and revision of the document is appropriate. Memorandum and Order, Civil Action No. C–2–79–294 (June 22, 1979). The ultimate issue to be decided in this case is thus quite narrow: namely, whether the Administrator has abused his discretion in establishing the time frame for review and revision of the criteria and in refusing to expedite the schedule. The Court determined that it had jurisdiction under 28 U.S.C. § 1331(a) to review the Administrator's exercise of discretion in this regard.

It is important to be aware of the scope of review a court has when examining an administrative exercise of discretion.[4] The

---

of this title, or his action under section 119(c)(2)(A), (B), or (C) (as in effect before August 7, 1977) or under regulations thereunder, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

3. 42 U.S.C. § 7604(a) reads as follows:

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to be in violation of any condition of such permit. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be.

4. This is nonstatutory review for which reference to the review provisions of the Administrative Procedure Act is properly made. Davis, *Administrative Law of the Seventies* § 23.09 at 543 (1976). While § 10(a) of that Act, 5 U.S.C. § 701(a), excepts from judicial review "agency action committed to agency discretion by law," the Supreme Court has made clear that this exception is very narrow, applicable only in rare instances when " 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971), citing S.Rep.No. 752, 79th Cong., 1st Sess., 26 (1945). The Administrator's discretion in the instant case lies somewhere in the gray area between reviewable agency discretion and that "committed by law" which is not subject to judicial review. On the one hand, the time period within which he must complete his task is defined with some specificity by Congress in §§ 7408 and 7409 of the Act. On the other hand his discretion is arguably quite broad since Congress set no specific standards to guide his actions in conducting the review and revision. Within this gray area, I believe there is "law to apply" and I therefore find the conduct at issue to be reviewable by this Court.

Supreme Court has indicated that a two-step procedure is required, entailing first, a determination whether the agency has acted within the scope of its statutory authority, and, second, whether the actual choice made was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

To make the latter finding, the Court must undertake a "searching and careful" inquiry into the facts, but the ultimate standard of review is a narrow one. It consists ultimately of determining "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, supra.* The law is clear that this inquiry is narrower than the "clearly erroneous" review to which lower judicial fact-finding is subjected. Thus while a court reviewing administrative discretion must carefully scrutinize the facts, "[t]he court is not empowered to substitute its judgment for that of the agency." *Overton Park, supra; Ethyl Corp. v. EPA*, 176 U.S.App. D.C. 373, 406–407 n.74, 541 F.2d 1, 34–35 n.74 (D.C.Cir.1976). A court reviewing for abuse of discretion will reverse for "clear error of judgment" only when the error is so clear as to deprive the agency's decision of a rational basis. *Id.; D.C. Federation of Civic Associations v. Volpe*, 148 U.S.App. D.C. 207, 223–24, 459 F.2d 1231, 1247–48 (D.C.Cir.1972).

In an earnest attempt to avoid "essaying comprehensive definition," Justice Friendly nonetheless articulated in different words the same standard to guide a court facing this task. Reviewing a decision by the Immigration and Naturalization Service not to suspend a valid order deporting the appellant, he stated for the Second Circuit Court of Appeals:

> [W]e think the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational

explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group, or, in Judge Learned Hand's words, on other "considerations that Congress could not have intended to make relevant." *U. S. ex. rel. Kaloudis v. Shaughnessy*, 180 F.2d 489, 491 (2d Cir. 1950).

*Wong Wing Hang v. INS*, 360 F.2d 715 (2d Cir. 1976).

These principles guide the Court in its examination of the ultimate issue. They likewise guide the Court in determining the question posed by the present posture of the case, that is, whether Consol has satisfactorily demonstrated that preliminary injunctive relief is warranted. This inquiry requires the Court to determine whether the plaintiff has shown:

(a) A strong or substantial likelihood or probability of success on the merits;

(b) irreparable injury;

(c) that the issuance of a preliminary injunction would not cause substantial harm to others; and

(d) that the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). No single factor is necessarily dispositive; proper judgment entails a balancing of all elements involved.

A hearing was held on this motion. After consideration of the pleadings and the evidence and arguments of counsel presented at the hearing, the Court finds the following facts and makes the following conclusions of law.

### III. *Facts*

The current criteria document for sulfur oxides[5] was published in January 1969, based on scientific data existing prior to that time. Based on the 1969 criteria docu-

---

5. Air Quality Criteria for Sulfur Oxides, U. S. Department of Health, Education and Welfare, National Air Pollution Control Administration. Washington, D. C. Publication No. AP–50. 178

p. (1969) was issued by the Commissioners of the National Air Pollution Control Administration pursuant to former § 107b1 of the Clean Air Act (42 U.S.C. § 1857c–2b1 (1970)).

ment, the EPA Administrator[6] promulgated standards for sulfur dioxide in 1971.[7] These standards define the level of air quality which the Administrator judges necessary, with an adequate margin of safety, to protect the public health.

These standards are in effect today.[8] Under the Clean Air Act, a state implementation plan has been promulgated for Ohio designed to attain compliance with the federal standards.[9] Plaintiff argues that pursuant to that plan, utilities in the state must achieve specified levels of sulfur dioxide emission by October 19, 1979, after which they will be subject to penalties for non-compliance.

Plaintiff Consol mines and sells coal used to generate electricity in several states including Ohio. The burning of coal emits sulfur dioxide as a by-product. Coal mined by the plaintiff in Ohio has a higher sulfur content than that mined in some other states. Utility customers of Consol are not able to attain the emission levels indicated when burning this "high-sulfur" coal without the installation of expensive emission-reduction equipment (scrubbers) at their plants. The alternative is to cease burning coal with high sulfur content, and to replace it with "low sulfur coal," which is not available from Consol. Several of plaintiff's utility customers in Ohio have either cancelled existing contracts or failed to renegotiate and renew contracts upon their expiration in order to substitute low-sulfur coal and thereby meet the impending compliance levels. Other customers, notably the Cleveland Electric Illuminating Company and Ohio Edison, are still under contract with Consol but have notified the plaintiff that they may terminate their coal contracts for the same reasons.

Consol has closed part of its Ohio mining operations and expects to be forced to substantially decrease its total coal mining operations in Ohio if further losses of sales to Ohio utility companies occur. As a result of the cancellations of coal contracts, Consol has diminished its work force and anticipates that if further reductions in its operations are required, many more of its workers will face unemployment.

The scientific validity, in light of modern knowledge, of the 1969 criteria document, is the subject of great dispute. The document published in 1969 was a revision of a document published in 1967, based on scientific knowledge existing prior to that time. The plaintiff presented the testimony of two experts on air pollution who were of the opinion that scientific studies over the past decade indicated that the adverse effects of sulfur oxides on public health are not as severe as it was thought when the criteria document was prepared, and that if the criteria document were reviewed and revised, it ought to result in a liberalization of existing standards for that pollutant.

Plaintiff introduced, by way of deposition, the expert testimony of the late Dr. Arend Bouhuys, to the effect that the criteria document was scientifically defective when published, that it rested in part on preliminary findings which were later refuted by the same researchers in a follow-up study, and that several studies conducted in the early seventies, including some he had done himself, indicated that the correlation between sulfur oxides and health hazards was not as substantial as had been thought in the 1960's. Dr. Bouhuys published some of these opinions in his book,

6. The responsibilities of the Secretary of H.E.W. regarding air pollution were transferred to the EPA when Congress passed the Clean Air Act Amendments of 1970, 84 Stat. 1677, 1713, P.L. 91–604, §§ 3(b)(2), 15(a), 15(c) (Dec. 31, 1970).

7. 40 C.F.R. § 50.4 (1979).

8. This case concerns the primary standards which are those established for the protection of human health. 40 C.F.R. § 50.2(b). The secondary standards, designed to protect the public welfare from effects of pollutants on the environment other than human health, were revised in September 1973 after the EPA revised Chapter 5 of the 1969 Criteria Document ("Effects of $SO_2$ in the Atmosphere on Vegetation") the same year.

9. 41 Fed.Reg. 36,324 (1976), as amended 41 Fed.Reg. 52,455 (1976) and 42 Fed.Reg. 27,588 (1977), codified in 40 C.F.R. § 52.1875.

*Breathing—Physiology, Environment and Lung Disease* (1974).

Of the same opinion was plaintiff's expert, Arthur Stern. From July 1975 to June 1976, Mr. Stern chaired the National Air Quality Criteria Advisory Committee (NAQCAC), a body designated by the Administrator of the EPA to advise him on the adequacy and revision of standards. Under Stern's direction, the Committee undertook a thorough review of the criteria documents for all the ambient air pollutants, including that for sulfur oxides. Each document review was conducted simultaneously by a subgroup of the Committee. In June 1976, NAQCAC submitted its findings and recommendations to the EPA. These included the determination that all six criteria documents, "while they represented good or fair reviews and evaluations when they were prepared, are now out-of-date and need major revision." NAQCAC recommended that the existing criteria documents be "re-evaluated and that revised . . . documents be prepared and issued." With respect to the sulfur oxides criteria document, in particular, the Committee concluded that it was "in serious need of revision and that such a revision is not only desirable, but necessary."

NAQCAC was abolished by the EPA Administrator at the end of Stern's term in June 1976; its responsibilities were absorbed by another body within the EPA, the Science Advisory Board. The EPA responded to the Committee's recommendations in a letter of October 12, 1976, saying the recommendations were well-founded and setting forth a schedule for the revision and reissuance of the criteria documents. The letter stated:

> The preparation of revised drafts is to be completed over the next three years in accordance with the following schedule.
>
> Photochemical oxidants (and related Hydrocarbons)—August 1977
>
> Nitrogen Oxides—February 1978
>
> Carbon Monoxide—August 1978
>
> Sulfur Oxides (and associated Particulates)—August 1979

Particulate Matter—August 1979.

Formal publication was anticipated from three to fifteen months thereafter, depending on whether new standards were necessitated.

Responding, Mr. Stern suggested that the review could be undertaken on a shorter timetable, with completion set for February 1978. Stern testified that in his opinion the entire review process could be completed in fourteen months.

Dr. Bouhuys testified that the process could be completed in six to twelve months.

Mr. Michael Berry, the Deputy Director of the Environmental Criteria and Assessment Office,[10] who served in several capacities within the EPA since 1972, testified that the average criteria document takes the EPA from nine to twelve months to review and revise, not including external review.

Mr. Berry testified about the efforts of the EPA to maintain an "ongoing review" of sulfur oxides data. He identified a report issued in January 1973 to which he contributed, consisting of a re-evaluation of the health basis for existing air quality standards, which noted that sulfur dioxide standards were based on inadequate data, but concluded that more recent data strengthened the case for maintaining the standards and provided support for the position that existing standards were "not too high." Another study was prepared by the National Environmental Research Center, Office of Research & Development of the EPA in March 1974—and reviewed by NAQCAC in January 1973—which examined the sulfur oxides criteria with a focus on the potential hazards of sulfur compounds aside from sulfur dioxide. That report concluded that existing data was inadequate to establish appropriate criteria for these pollutants, and outlined a research and development program to supply the necessary information and technology. Other reviews of scientific data prior to the

10. The Environmental Criteria and Assessment Office or ECAO is the subdivision within the EPA primarily responsible for conducting the criteria review.

NAQCAC report prepared by or read by the EPA staff follow the same pattern, generally supporting the retention of existing standards either until more information would be available or on the grounds that existing levels were designed with a public health margin built in.

After the NAQCAC report, the outlook regarding the standards was not greatly altered. As late as May 1978, one reviewer of research concluded that "in view of the limited data, it does not seem reasonable to change the short term (24 hour) standard at this time." Ferris, Health Effects of Exposure to Low Levels of Regulated Air Pollutants, [Defendants' Exhibit 20].

A report prepared by Mr. Berry's office on June 19, 1978, indicates the agency had begun planning for the revision of the criteria document. In that report the authors concluded that it had gradually become apparent that sulfur dioxide by itself is of relatively low toxicity, but when present with particulate matter or ozone, or after conversion to particulate sulfate or sulfuric acid, it can cause adverse health effects. The report noted that a synergistic effect appeared to take place between sulfur dioxide, particulates and humidity, and that both sulfur dioxide and particulates originate from the burning of fossil fuels, such as coal. Accordingly, the report concluded that sulfur oxides and particulates should be combined in one document.

Upon consideration of the testimony of plaintiff's experts, and review of the numerous studies submitted as exhibits by both parties, I conclude that while the criteria document for sulfur oxides is clearly outdated and in need of revision, considerable differences remain today among scientific experts regarding the effect such a revision should have on the national standards for which it serves as foundation. Continued research into the health effects of sulfur oxides appears to have yielded few clear-cut answers, but rather has merely expanded the area of legitimate difference of opinion. The resulting state of ambiguity concerning the air quality standards and the scientific basis for them appears to remain much as it was described by Dr. John H. Knelson, Director, Human Studies Laboratory, an office of the EPA, in 1975:

I have reviewed what I believe to be the most pertinent sources of information available for assessing the adequacy of current ambient air quality standards. Although considerable controversy surrounded the promulgation of the standards, and that controversy continues, I do not believe the best information available today supports relaxation of any of the standards. These standards are scientifically defensible, although room exists for honest differences of opinion concerning interpretation of those data on which they are based.[11]

The schedule originally promulgated and approved, contemplating the completion of a draft for external review in August 1979, has been, whether by design or circumstance, fairly closely adhered to. There have been delays, however, and deadlines earlier set have not been met.

Some planning for a new sulfur oxides-particulates criteria document was undertaken earlier, but actual work on the project commenced in July 1978. A plan and schedule for the project was established in July and an EPA review group met and formulated an outline for the document in August. Writing assignments were to be made in August, with a first draft available in February 1979. Various internal and external reviews were to occur during 1979, with a final document appearing in May 1980.

This schedule set June 1979 for the first external review. Mr. Berry testified that the agency is running behind schedule, and that it is currently aiming for October 1979 for the first external review. Mr. Berry also voiced his opinion that meeting that

11. Assessment of the Current Scientific Bases for Achieving Clean Air in the United States: Statement Prepared in Support of Testimony Presented at Hearings of the United States Senate Committee on Public Works/Subcommittee on Environmental Pollution (unpublished, April 18, 1975).

deadline was "unlikely." He further anticipated that the May 1980 deadline for a final preprint would not be met, but that there was a very good probability of meeting the December 1980 completion date. Currently, the agency is receiving various chapters of the document as they are submitted by their respective authors.

Considerable testimony bore on why the EPA had not begun the review and revision process sooner, and why the process has not been conducted at a faster pace. Plaintiff introduced a memorandum issued in November 1977 by Vandy Duffield, a member of the ECAO, who is identified as "project officer" in the memorandum, setting forth a proposed schedule for the new sulfur oxides document anticipating a final working copy in May 1979. This schedule was never approved by those who ultimately assumed responsibility for the project.

One reason given for not beginning sooner and proceeding faster was the absence of sufficient manpower resources. At the time of the 1977 amendments to the Clean Air Act, Pub.L. 95–95, 91 Stat. 691, which required revision of the criteria documents, criteria documents for six classes of pollutants existed. The agency established a priority system among the six, in order to meet deadlines. Since Congress had mandated the revision and reissuance of nitrogen oxides criteria within six months, 42 U.S.C. § 7408(c), that project was placed at the top of the list. The document review for photochemical oxidants was expedited pursuant to court order. The combined document for sulfur oxides and particulates was placed near the middle.

At present, according to Mr. Berry's testimony, the sulfur oxides/particulates matter criteria document is receiving top priority and his office is doing everything it can to expedite its issuance. Mr. Berry stated that progress on the document could not proceed any faster than it is now.

## IV. *Discussion of Law*

As noted above, the ultimate issue in this case is whether the Administrator of the EPA has abused its discretion in setting its schedule for review, revision and reissuance of the criteria document for sulfur oxides and in refusing to expedite the process. The relief plaintiff presently asks this Court to provide is an order preliminarily enjoining the defendants to expedite the review and revision process.

### A. *Likelihood of Success on the Merits*

The first question raised by plaintiff's motion is whether it is likely to prevail upon the ultimate issue. The standard and scope of the Court's review has been delineated above. This inquiry is limited to an analysis of whether the Administrator has acted within the scope of his authority and, if so, whether the exercise of discretion within those bounds can be regarded as rationally based. Upon a careful examination of the facts and law, I conclude that there is. no substantial likelihood that the plaintiff can prevail on either question.

The 1970 amendment, enacting § 7408, became effective December 31, 1970. From that date onward, the Administrator was obligated to review the criteria document from time to time and, when he deemed it appropriate, to modify and reissue it. The Administrator argued at the hearing that the numerous studies undertaken by his agency and the review of studies undertaken by others concerning new scientific data on the health effects of sulfur oxides constituted an "ongoing review" sufficient to satisfy the review mandated by statute. While I have no question that this activity is within the Administrator's responsibility and certainly is basic to the Administrator's execution of his duties with regard to the Clean Air Act, I do not believe this ongoing, informal review of scientific data was what Congress intended by the word "review." Section 7408(c) of the statute speaks of a review of the criteria document, which, when read in conjunction with subsection (a)(2), requiring the criteria to reflect accurately the latest scientific knowledge in the area, presupposes a review of the literature in the field.

Nonetheless, I do believe that this "ongoing review" is relevant to the reasonableness of the Administrator's timing of the

review. Prior to the 1976 NAQCAC report, the Administrator's review of scientific literature had disclosed two things: first, that inadequate data existed on the health effects of sulfur oxides, and second, that existing data supported the maintenance of existing standards. Since the ultimate purpose of the criteria is to provide a scientific basis to guide the Administrator in setting the standards, so long as no new information was conclusive or persuasive and more information was expected, a change in the existing criteria document would be only marginally helpful. Furthermore, although the issue here is the *criteria document* and the Administrator unquestionably has an independent duty to revise it, regardless of the standards, so long as a revision of the criteria would not support a modified *standard*, the Administrator was arguably justified in postponing such action.

In any event, there is no evidence that, prior to the issuance of the NAQCAC report in June 1976, the Administrator had been requested to revise the criteria document. To be sure, Dr. Bouhuys had criticized the scientific basis for the document as early as 1974 in his book. But the statute's command falls far short of requiring the Administrator to revise his criteria every time a new study appears or a criticism is leveled—even by an eminent scientist in the field.

The NAQCAC report did put the Administrator on notice that in their view the document was "in serious need of revision and that such a revision is not only desirable, but necessary." The EPA response, setting forth a three-year schedule contemplating completion of the task in August 1979, does not explain why the EPA chose not to act more promptly on the NAQCAC recommendation. On the other hand, it is clear that the EPA was under a § 7408(c) duty with respect to each of the pollutants. It is equally clear that Congress had not, prior to 1977, made any attempt to dictate how the Administrator should allocate his resources to accomplish this goal.

Work on the sulfur oxides document began in 1978. Even if the Court were to conclude that waiting this long to begin the project was far outside the period contemplated by Congress when it wrote in the 1970 amendment about "from time to time," and was an abuse of the discretion delegated by that phrase, such a conclusion would not resolve the real issue in this case: whether the review and revision should be ordered to be completed earlier.

As to this question, I find that Congress, in enacting the 1977 amendments, so altered the Administrator's discretionary duty that it effectively authorized the timetable he has chosen.

The pertinent provision is 42 U.S.C. § 7409(d)(1), which provides:

Not later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate in accordance with section 7408 of this title and subsection (b) of this section. The Administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph.

The plain meaning of this language is to set outer limits on the Administrator's discretion regarding when the criteria should be reviewed. The legislative history of the 1977 amendments does not reveal whether the December 1980 deadline and five-year intervals were intended by Congress as an extension of the time permitted the EPA for this task or as a response to a perceived failure of the EPA to act more promptly. Congress did consider a time schedule calling for initial review 18 months after enactment, and periodic review every two years thereafter. H.R.Rep. No. 294, 95th Cong., 1st Sess. 10, 179–83, reprinted in [1977] U.S. Code Cong. & Admin.News, pp. 1077, 1088, 1258–62. This proposal was rejected in favor of the enacted time limits in the conference of both Houses. H.Conf.Rep. No. 564,

95th Cong.2d Sess. 124, reprinted in [1977] U.S.Code Cong. & Admin.News, pp. 1077, 1504–05. The plain language of the statute has the same effect regardless of which motive prompted Congress to enact it. It clarifies the Administrator's duty with regard to review of the criteria by substituting the more specific limits of the December 1980 date and five-year intervals for the "from time to time" language of § 7408(a). As I read the statute, so long as the Administrator completes his review and any revision he deems appropriate by December 31, 1980, he will be acting within the authority delegated to him by Congress.

Within the bounds of discretion delegated to him by Congress, is it likely that the Administrator has acted without consideration of the relevant factors or has committed a clear error of judgment? In the Court's view, it is not.

We begin with the presumption of regularity that attaches to an administrator's decisions. *Overton Park, supra*, 401 U.S. at 415, 91 S.Ct. 814; *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138 (1935). In the instant case, there is no evidence tending to rebut that presumption; there is no evidence that the Administrator inexplicably departed from established policies or that the actions complained of rest on an impermissible basis.

Next, I note that the law is well-established that an administrative agency has wide discretion in controlling its calendar, in determining the relative priority to give its diverse responsibilities and in how to allocate its resources. *Nader v. F. C. C.*, 172 U.S.App.D.C. 1, 520 F.2d 182 (D.C.Cir. 1975); *Utah Agencies v. CAB*, 504 F.2d 1232, 1236 (10th Cir. 1974) (finding no abuse of discretion in refusal to expedite hearing and relief). Courts have been often warned rarely to intervene in such internal decision-making. As the Court of Appeals for the District of Columbia Circuit stated:

No principle of administrative law is more firmly established than that of agency control of its own calendar. Practical problems of calendar administration confront an agency whenever related applications are pending at the same time. Consolidation, scope of the inquiry, and similar questions are housekeeping details addressed to the discretion of the agency and, due process or statutory considerations aside, are no concern of the courts. *City of San Antonio v. CAB*, 126 U.S.App. D.C. 112, 374 F.2d 326 (D.C.Cir.1967) (citations omitted).

From the evidence, it appears that the EPA had several grounds for establishing the sulfur oxides schedule as it did.

Plaintiff complains that each of the documents should have been reviewed by subgroups within the ECAO simultaneously as had been done by NAQCAC according to the 14-month suggestion of Dr. Stern or according to the plan proposed by Vandy Duffield, rather than seriatim. Mr. Berry testified that the agency did not have the resources to conduct a simultaneous review, and this is precisely the type of question that he is equipped to make without interference by a court.

The sulfur oxides document was given intermediate priority behind nitrogen oxides (for which Congress had established a priority for the Administrator) and photochemical oxidants (which the EPA was under court order to complete). Under such pressure, given finite resources from which to draw, the Court will not substitute its judgment for that of the Administrator in establishing his priorities.

Finally, the testimony of Berry by deposition indicated that pressure to conform the development of scientific criteria to artificial deadlines setting compliance dates for the industry works against the purpose of producing an inefficient, scientifically valid document.

Some of the reasons given are more compelling to this Court than others. In particular, the Court has great difficulty understanding why the EPA did not begin sooner once it made a commitment to conduct the review. But all combine to demonstrate that the Administrator's decision to establish the schedule for the review and revision

of the sulfur oxides criteria document and his subsequent refusal to expedite the schedule were rationally based.

Therefore, I can find no abuse of discretion in the actions taken by the Administrator.

One other issue should be addressed at this point. In plaintiff's original complaint, it challenged not only the Administrator's "delay" in reviewing and revising the document on statutory grounds, but raised constitutional challenges to the Act as well. If the Administrator has not abused the discretion granted him by Congress, then the course remaining to plaintiff is to attack the validity of the statute.

Plaintiff complains that Congress granted an excessive delegation of authority to the Administrator, that the current standards bear no reasonable relationship to the objective of the Act to protect the public health, and that the effect of the Administrator's failure to review and revise by denying the plaintiff the opportunity to mine and sell coal at a profit constitutes a deprivation of plaintiff's property without due process or just compensation.

Plaintiff is unlikely to travel far with any of these attacks for several reasons. First, the courts view with skepticism the action of a litigant in challenging the constitutionality of portions of a statute under which it simultaneously seeks benefits. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Moreover, the Supreme Court has upheld only one challenge to a statute on the grounds of excessive delegation of legislative power, and only under circumstances far different from those here. *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

Finally, the Clean Air Act has withstood repeated constitutional attacks similar to those raised in this case. *See, e. g., Union Electric Co. v. EPA*, 427 U.S. 246, 256, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150, 1164 (6th Cir. 1978); *South Terminal Corp. v. EPA*, 504 F.2d 646, 676–80 (1st Cir. 1974); *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 173 (6th Cir. 1973).

Upon review of the evidence and the applicable law, I now conclude, for the purposes of plaintiff's motion for preliminary injunction, that the Administrator acted within the scope of his authority in establishing the sulphur oxides timetable and refusing to expedite it; that in so exercising the authority properly delegated to him by Congress, he acted on a rational basis; and that therefore, he has not abused his discretion. Accordingly, I hold that plaintiff has not shown that it has a substantial likelihood of prevailing on the merits.

#### B. *Irreparable Harm*

The evidence establishes that plaintiff is suffering great economic losses as a result of the efforts of its customers to comply with the national ambient air quality standards. Most of these losses have already occurred; a preliminary injunction would not affect them at this time. The losses at issue are those anticipated to result from the shift by Cleveland Electric Illuminating Company and Ohio Edison to low-sulfur coal. The difficulty with plaintiff's position is the weak connection between the harm portended and the relief the Court has power to award. Plaintiff's theory rests upon a chain of inferences, some of which are not easily drawn from the evidence.

If the Court were to order the criteria review and revision expedited, plaintiff would soon have revised, up-to-date criteria; new standards are by no means certain to follow. The utilities' obligations under the Clean Air Act flow from the standards, not the criteria.

Even assuming that the new criteria support a relaxed standard for sulfur oxides, this would not alter the utilities' obligation to meet the current standards. Moreover, as I read the law, the EPA would still be permitted until December 31, 1980, to revise the standards themselves.

Plaintiff claims that if the criteria are updated, and if they support a lower standard, then it may challenge the standard in the courts of appeals. In my opinion, while

the plaintiff's harm is indeed grave, its nexus with the relief sought in this case is too speculative to warrant preliminary relief.

### C. *Harm to Others versus Benefit to the Public*

The last two factors to be examined by a court on a motion for preliminary injunction are, under the circumstances of this case, balanced against one another. I believe it is fair to say that this balancing process is not presented to the Court as a matter of first impression: Congress clearly grappled with the competing interests in drafting the Clean Air Act amendments of 1970 and 1977. As the legislative history of those amendments makes clear, Congress placed the health of the public above the economic well-being of industry sources of air pollutant emissions. *See, e. g., Union Electric Co. v. EPA*, 427 U.S. 246, 258–59, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). This is a policy decision which Congress has made and which this Court cannot judicially veto.

### V. *Conclusion*

For the reasons discussed above, I find that plaintiff has been unable to establish that preliminary relief is warranted in this case. Therefore, plaintiff's motion for preliminary injunction is hereby DENIED.

It is so ORDERED.