# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

**444444444444444**
**NO. 03-03-00121-CV**
**444444444444444**

**Brazoria County, Texas, Appellant**

**v.**

**Texas Commission on Environmental Quality, f/k/a Texas Natural Resource Conservation Commission; Texas Transportation Commission; and Texas Department of Transportation, Appellees**

**4444444444444444444444444444444444444444444444444444444444444**
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT**
**NO. GV100139, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**
**4444444444444444444444444444444444444444444444444444444444444**

## O P I N I O N

In this case, Brazoria County challenges the Texas Transportation Commission's imposition of environmental speed limits on highways in Brazoria County and several rules and orders of a state implementation plan developed by the Texas Commission on Environmental Quality to attain the national ambient air quality standard for ozone in the eight-county Houston-Galveston area. The district court declared that the rules and orders conformed with the agencies' statutory powers and with the requirements of the Texas Administrative Procedure Act. We affirm the judgment of the district court.

## BACKGROUND

The facts in this case are not in dispute. Congress, in the Federal Clean Air Act (FCAA), authorized the United States Environmental Protection Agency (EPA) to set standards for the cleanliness of ambient air. *See generally* 42 U.S.C.A. §§ 7401-7671 (West 1995 & Supp. 2003). These standards are called national ambient air quality standards, or NAAQS. *See id*. § 7409 (West 1995). The FCAA requires states to make and submit written plans to meet or attain the NAAQS, referred to as state implementation plans (SIPs). *See id*. § 7407(a) (West 1995). SIPs are sets of strategies for attaining the NAAQS. *See id*. § 7410 (West 1995). They must be supported by rules or other state-law based, legally enforceable control mechanisms that limit emissions of contaminants from sources whose operation may undermine NAAQS attainment. *See id*. § 7410(a)(2)(E). If a state chooses not to develop a SIP or is unable to develop an approvable SIP, the EPA has the authority to impose sanctions, such as the withholding of federal highway funds and the imposition of federal air pollution control measures, until the state comes into compliance. *See id*. §§ 7410(m), 7509.

The EPA has designated the eight-county Houston-Galveston area (HGA), including Brazoria County, as a severe-17 one-hour ozone non-attainment area. *See* 26 Tex. Reg. 361 (2001) (codified at 30 Tex. Admin. Code §§ 114.50-.53). This designation indicates that air quality in the HGA does not satisfy the one-hour ozone NAAQS and that Texas is therefore required to attain the one-hour ozone standard of .12 parts per million in the HGA. 42 U.S.C.A. §7511(a)(2) (West 1995); 26 Tex. Reg. at 361. Accordingly, the FCAA requires Texas to submit a plan to improve air quality in the HGA and to demonstrate that the plan will result in attainment of the NAAQS. *See generally*

2

42 U.S.C.A. § 7410 (West 1995). The deadline for attainment in the HGA is November 15, 2007. *See* 42 U.S.C.A. § 7511(a)(2) (West 1995).

In Texas, TCEQ is the state agency generally charged with protection of air quality within the state. *See, e.g.*, Tex. Health & Safety Code Ann. §§ 382.011(a)(2) & (3) (West 2001), .012 (West 2001), .017 (West 2001), .019 (West 2001 & Supp. 2004), .039 (West 2001). In response to the EPA's mandate, TCEQ promulgated several rules affecting the HGA in adopting the SIP. The HGA SIP contained provisions requiring the establishment of a vehicle inspection and maintenance program as well as a commercial lawn-equipment rule. 26 Tex. Reg. at 361; 26 Tex. Reg. 403 (2001) (codified at 30 Tex. Admin. Code §§ 114.452, .459). Also, the SIP required the adoption in all eight HGA counties of environmental speed limits (ESLs), which the Texas Transportation Commission (the Transportation Commission) adopted in 2000. 25 Tex. Reg. 5686 (2000) (codified at 43 Tex. Admin. Code §§ 25.20, .23-.24).

## DISCUSSION

In eight issues, Brazoria County challenges the three different control measures contained in the HGA SIP:

(1) Lowering highway speed limits to 55 miles per hour (mph) on all roads within Brazoria County that previously had a speed limit of greater than 55 mph (the "environmental speed limit" or ESL), *see* 43 Tex. Admin. Code §§ 25.23(f), .24(b)(8) (2003);[1]

---

[1] Because the department of transportation proposed these speed limits as "environmental speed limits," *see* 25 Tex. Reg. 5686 (2000) (codified at 43 Tex. Admin. Code §§ 25.20, .23-.24), and because all parties in this case refer to them as such, we will use that term throughout this opinion.

3

(2)  Effective May 1, 2003, imposing vehicle inspection and maintenance rules (I/M Rules) on vehicles registered in Brazoria County, 30 Tex. Admin. Code §§ 114.50-.53 (2003); and

(3)  From April 1 to October 31 of each year, limiting the use of commercial lawn-maintenance equipment to the afternoon hours, beginning in 2005 (the lawn-maintenance rules), *id*. §§ 114.452, .459 (2003).

Brazoria County alleges that these provisions exceed the authority granted in the Texas Clean Air Act and Texas Transportation Code.  Further, it argues that they do not comply with the procedural requirements of the Texas Administrative Procedure Act and are otherwise arbitrary, capricious, or without reasoned justification.[2]

### *Standard of Review*

Because this case requires us to construe various statutory provisions, we begin with an examination of the appropriate standard of review.  Statutory construction is a question of law, which we review *de novo*.  *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989).  It is a cardinal rule of statutory construction that we are to give effect to the intent of the legislature.  *See Fleming Foods v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999).  To determine legislative intent, courts may consider the language of the statute, the legislative history, the nature and object to be obtained, and the consequences that would follow from alternate constructions.  *In Re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 380 (Tex. 1998).  In interpreting a statute, every word is presumed to have been used for a purpose, and every word excluded must also be presumed

---

[2] Brazoria County offers its arguments in eight issues, which we will describe in detail when we discuss them.

4

to have been excluded for a purpose. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

The powers of an agency include the powers delegated by the legislature in clear and express statutory language, together with any implied powers that may be necessary to perform a function or duty delegated by the legislature. *GTE Southwest, Inc. v. Public Util. Comm'n*, 10 S.W.3d 7, 12 (Tex. App.—Austin 1999, no pet.). When the legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001). Finally, construction of a statute by an agency charged with its enforcement is entitled to serious consideration, as long as the construction is reasonable and does not contradict the plain language of the statute itself. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993).

## A. Environmental Speed Limits

### *Authority to Adopt Environmental Speed Limits (ESLs)*

In its first issue, Brazoria County contends that the Transportation Commission violated its statutory authority by adopting ESLs. It argues in three sub-issues that: (i) the consideration of environmental and air quality concerns in altering *prima facie* speed limits is outside of the Transportation Commission's statutory authority; (ii) the ESL rules constitute an impermissible revision to the "Procedure for Establishing Speed Zones" under the transportation code; and (iii) the ESL rules result from an impermissible delegation of authority to alter speed limits from the Transportation Commission to the TCEQ. We will address each sub-issue in turn.

5

*Transportation Commission's Statutory Authority*

  First, Brazoria County argues that consideration of federal funding and air quality are outside the authority of the Transportation Commission to consider when altering speed limits under Section 545.353 of the transportation code.[3] *See* Tex. Transp. Code Ann. § 545.353 (West Supp.

---

[3] At the time the Transportation Commission adopted the environmental speed limits, section 545.353 provided:

 (a) If the Texas Transportation Commission determines from the results of an engineering and traffic investigation that a prima facie speed limit in this subchapter is unreasonable or unsafe on a part of the highway system, the commission, by order recorded in its minutes, and except as provided in subsection (d), may determine and declare:

  (1) a reasonable and safe prima facie speed limit; and

  (2) another reasonable and safe speed because of wet or inclement weather.

 (b) In determining whether a prima facie speed limit on a part of the highway system is reasonable and safe, the commission shall consider the width and condition of the pavement, the usual traffic at the affected area, and other circumstances.

 (c) A prima facie speed limit that is declared by the commission under this section is effective when the commission erects signs giving notice of the new limit. A new limit that is enacted for a highway under this section is effective at all times or at other times as determined.

 (d) The commission may not:

  (1) modify the rules established by Section 545.351(b);

  (2) establish a speed limit of more than 70 miles per hour; or

  (3) increase the speed limit for a vehicle described by Section 545.352(b)(5).

 (e) The commission, in conducting the engineering and traffic investigation

2004). In response, the Transportation Commission argues that the legislature ratified its actions in 2003. We agree with the Transportation Commission.

A court may properly consider the history of the subject matter in determining the purpose and intent of the law. *Calvert v. Fort Worth Nat'l Bank*, 356 S.W.2d 918, 921 (Tex. 1962) (citing *Magnolia Petroleum Co. v. Walker*, 83 S.W.2d 929, 934 (Tex. 1935)). Where the meaning of a statutory provision is unclear, in doubt, or ambiguous, the interpretation placed upon the provision by the agency is entitled to weight. *Calvert v. Kadane*, 427 S.W.2d 605, 606 (Tex. 1968). Once the statute is given a particular interpretation, a court is entitled to assume that the legislature, by failing to amend the statute, indicated its approval of the interpretation. *Robinson v. Central Tex.*

---

specified in Subsection (a), shall follow the "Procedure for Establishing Speed Zones" as adopted by the commission. The commission may revise the procedure to accommodate technological advancement in traffic operation, the design and construction of highways and motor vehicles, and the safety of the motoring public.

(f)  The commission's authority to alter speed limits applies:

(1)  to any part of a highway officially designated or marked by the commission as part of the state highway system; and

(2)  both inside and outside the limits of a municipality, including a home-rule municipality, for a limited-access or controlled-access highway.

(g)  For purposes of this section, "wet or inclement weather" means a condition of the roadway that makes driving on the roadway unsafe and hazardous and that is caused by precipitation, including water, ice, and snow.

Act of May 1, 1995, 74th Leg., R.S., ch. 165, § 1, sec. 545.353, 1995 Tex. Gen. Laws 1025, 1637, *amended by* Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 30.111, 1997 Tex. Gen. Laws 327, 642. The legislature made amendments unrelated to the discussion in this case in 2001. *See* Act of May 18, 2001, 77th. Leg, R.S., ch. 1518, § 1, 2001 Tex. Gen. Laws 6403, 6403.

*MHMR Ctr.*, 780 S.W.2d 169, 170 n.4 (Tex. 1989) (citing *Allen Sales & Servicenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex. 1975)); *Direlco, Inc. v. Bullock*, 711 S.W.2d 360, 363 (Tex. App.—Austin 1986, writ ref'd n.r.e.).

In this case, the legislature adopted *prima facie* speed limits for various types of roads and highways and in 1995 granted authority to the Transportation Commission to modify them. Tex. Transp. Code Ann. § 545.352 (West 1999); Act of May 1, 1995, 74th Leg., R.S., ch. 165, § 1, sec. 545.353, 1995 Tex. Gen. Laws 1025, 1637, *amended by* Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 30.111, 1997 Tex. Gen. Laws 327, 642. The legislature decided that the Transportation Commission could only change the *prima facie* speed limit if it "determine[d] from the results of an engineering and traffic investigation that a prima facie speed limit in this subchapter is unreasonable or unsafe on a part of the highway system." Tex. Transp. Code Ann. § 545.353(a). In conducting the required engineering and traffic investigation, the Transportation Commission had to "follow the 'Procedure for Establishing Speed Zones' as adopted by the commission" and could "revise the procedure to accommodate technological advancement in traffic operation, the design and construction of highways and motor vehicles, and the safety of the motoring public." *Id.* § 545.353(e). The statute also directed the Transportation Commission to consider "the width and condition of the pavement, the usual traffic at the affected area, *and other circumstances*" in determining whether a *prima facie* speed limit is reasonable and safe. *Id.* § 545.353(b) (emphasis added).

Relying on this language, the Transportation Commission adopted rules regarding two types of procedures for establishing speed zones—one for "regulatory" speed zones and another for

8

"environmental" speed zones. *See* 43 Tex. Admin. Code §§ 25.23(a),(f), .24(b)(8). Regulatory speed zones were established on parts of the highway system where the Transportation Commission determined the *prima facie* speed limit to be unreasonable or unsafe based on an engineering and traffic investigation that considers factors such as the average speed of motorists, rural/urban characteristics, the presence of schools, and the frequency of accidents. *Id*. § 25.23(a). Environmental speed limits, on the other hand, were based on an engineering and traffic investigation performed by TCEQ and were related to factors such as vehicle traffic, air pollution, and public health concerns. *Id*. § 25.23(f).

In 2000, the Transportation Commission issued minute orders regarding environmental speed limits. *Id*. §§ 25.20, .23-.24. The legislature did not substantively amend the statute in 2001, but in 2003 it added subsection j, which provides that the transportation commission "may not determine or declare, or agree to determine or declare, a prima facie speed limit for environmental purposes on a part of the highway system." Tex. Transp. Code Ann. § 545.353(j) (West Supp. 2004). At the same time, it announced that the new restriction "does not affect speed limits that have been approved by the Texas Transportation Committee before the effective date of this Act." Act of June 2, 2003, 78th Leg., R.S., ch. 1331, § 27(c), 2003 Tex. Gen. Laws 5993, 6000. We hold that by using this language to limit the scope of the 2003 amendment, the legislature effectively ratified the Transportation Commission's already existing environmental speed limits and acted only to prevent the Transportation Commission from imposing any environmental speed limits in the future. We overrule Brazoria County's challenge to the statutory authority of the Transportation Commission to issue environmental speed limits.

9

*Procedures for Establishing Speed Zones*

Brazoria County next argues that the ESL rules constitute an impermissible revision of agency procedures because the Transportation Commission stated that they were adopted to "contribute to the protection of the public health or help prevent the imposition of sanctions or restrictions on the use of federal transportation funds." *See* 25 Tex. Reg. at 5686. Specifically, Brazoria County argues that the Transportation Commission is not allowed to consider federal funding cuts or sanctions as part of its justification when revising the procedure for establishing speed zones. *See* Tex. Transp. Code Ann. § 545.353(e).

In this case, the Transportation Commission relied on section 545.353(e) of the transportation code, which allows the Transportation Commission to revise its procedure in order to "accommodate technological advancement in traffic operation, the design and construction of highways and motor vehicles, and the safety of the motoring public." *Id.* It believed that the effect of air pollution on public health and on eligibility for federal highway funds affects public safety. Because the legislature ratified the Transportation Commission's actions, we conclude that it decided that this effect formed a valid basis for revising the procedure. Thus, we hold that the Transportation Commission's concerns regarding public health fell within its statutory authority to revise the procedure in order to protect "the safety of the motoring public." *See id.*

*The Relationship between TCEQ, the Department of Transportation, and the Transportation Commission*

Third, Brazoria County argues that in setting the ESLs, the Transportation Commission impermissibly delegated its authority to alter speed limits to TCEQ. *See* 43 Tex.

Admin. Code §§ 25.23(f), 25.24(b)(8). We do not find its argument compelling. TCEQ was responsible for requesting, investigating, and designing an environmental speed zone. *Id*. That request was evaluated by TxDOT. *Id*. § 25.24(b)(8). Final authority for its adoption and approval remained with the Transportation Commission. *Id*. § 25.24(b)(8)(A). TCEQ served in an advisory capacity regarding ESLs and had no direct authority to alter *prima facie* speed limits. *See id*. Although TCEQ played an important role in the setting of ESLs, the Transportation Commission never delegated its authority to alter speed limits to the TCEQ because it always retained final authority to adopt or reject TCEQ's recommendations. *See id*.; 25 Tex. Reg. at 5686-87. Thus, Brazoria County's argument is without merit.

Having rejected all of its arguments relating to the Transportation Commission's statutory authority to adopt environmental speed limits, we overrule Brazoria County's first issue.

***Rules, Minute Orders, and the Procedural Requirements of the Administrative Procedure Act***

In its second issue, Brazoria County argues that the ESL minute orders are "rules" under the Administrative Procedure Act and therefore subject to rulemaking requirements. *See* Tex. Gov't Code Ann. §§ 2001.003(6) (West 2000), .021-.040 (West 2000 & Supp. 2004). We disagree.

A rule is "a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy; or (ii) describes the procedure or practice requirements of a state agency." *Id*. § 2001.003(6). In some sections of the transportation code, the legislature requires the Transportation Commission to adopt rules. *See* Tex. Transp. Code Ann. §§ 203.022, 223.004(e) (West 1999), 366.035(e) (West Supp. 2004), 391.032(a) (West 1999), 623.195(a) (West 1999).

11

However, the legislature authorized the Transportation Commission to alter *prima facie* speed limits "by order recorded in its minutes." *Id*. § 545.353(a).

In case of conflict between a general statutory provision and a special provision dealing with the same subject, the special provision controls the general. *See Commercial Standard Fire & Marine Co. v. Commissioner of Ins.*, 429 S.W.2d 930, 933 (Tex. Civ. App.—Austin 1968, no writ). In such circumstances, the special provision or statute is regarded as though it were an exception, removing something from the operation of the general law. *See Forwood v. City of Taylor*, 214 S.W.2d 282, 286 (Tex. 1948).

By using different words in its instructions to the Transportation Commission about implementing agency actions, the legislature purposefully intended to apply different procedural rules to different agency actions. For example, the Transportation Commission may use minute orders to designate a state highway as a controlled access highway, to deny or limit access to such a highway, and to erect protective devices that mark a controlled access highway. Tex. Transp. Code Ann. § 203.031 (West 1999). The Transportation Commission is also authorized to use minute orders to set the maximum weight for a vehicle and its load on a state highway, farm, or ranch road if a heavier weight would rapidly deteriorate or destroy the road. *Id*. § 621.102 (West Supp. 2004). On the other hand, when the legislature requires the Transportation Commission to adopt a rule, a more formal, elaborate procedure is implied. *See id*. §§ 21.115 (West 1999) (ordering Transportation Commission to adopt rules for issuing emergency loan or grant to aviation facility without public hearing), 203.022 (West 1999) (ordering Transportation Commission to adopt rules governing notice and comment procedures for local governments, public officials, and adjoining

12

property owners for major state highway project), 223.004 (West 1999) (requiring rules for rejecting bids for highway projects), 366.035 (West Supp. 2004) (ordering Transportation Commission to adopt rules requiring for approving regional tollway), 391.032 (West 1999) (mandating rules for regulation of outdoor advertising), 623.195 (West 1999) (requiring rules for issuing permits to move unladen lift-equipment motor-vehicles that exceed height and weight restrictions).

The context of the statutes in which the legislature authorized the use of minute orders to implement an agency action reflects an intent to simplify and minimize the procedure involved. Instances in which the legislature authorized other state agencies to use minute orders supports this interpretation. *See, e.g.*, Tex. Agric. Code Ann. § 76.144 (West 1995 & Supp 2004) (authorizing county commissioners court to delay or apply Department of Agriculture herbicide rule); Tex. Elec. Code Ann. § 32.002 (West 2003) (authorizing county commissioners court to extend appointment of election judges from one to two years); Tex. Gov't Code Ann. § 51.002 (West 1998) (allowing Texas Supreme Court to authorize a clerk *pro tempore* to appoint three deputy clerks); Tex. Water Code Ann. § 51.533 (West 2002) (authorizing water control and improvement district to fix rate of taxation and levy tax). In addition, the supreme court recognized the authority of agencies to use minute orders before the legislature passed the APA. *See, e.g.*, *Texas Highway Comm'n v. Texas Ass'n of Steel Importers*, 372 S.W.2d 525, 526 (Tex. 1963). Thus, when a statute authorizes agency action by an order recorded in its minutes, the legislature did not intend for those orders to be "rules" under the APA. As a result, the Transportation Commission did not have to subject its minute orders to the procedures required for rules under the APA. We overrule Brazoria County's second issue.

13

*"Reasoned Justification" for Environmental Speed Limits*

In its third issue, Brazoria County argues that the Transportation Commission violated the APA by not providing "reasoned justification" for the ESLs as required by the government code. *See* Tex. Gov't Code. Ann. § 2001.033 (West 2000). The legislature required state agencies to conduct a regulatory-impact analysis only of a "major environmental rule."[4] *Id*. § 2001.033(a). As we have discussed, the Transportation Commission passed the environmental speed limits by minute order rather than by rule. Because they are not rules, the requirements of section 2001.033 do not apply to them. We overrule Brazoria County's third issue.

**B. Inspection and Maintenance Rules**

*Authority to Adopt Inspection and Maintenance Rules*

In its fourth issue, Brazoria County argues that TCEQ only had statutory authority to adopt I/M rules for a limited geographic area that did not include Brazoria County. Specifically, it argues that, at the time TCEQ promulgated the I/M rules, the Texas Clean Air Act authorized TCEQ to regulate "any vehicle that is: (1) required to be registered in and is primarily located in Dallas, Tarrant, El Paso, or Harris County," and thus expressly limited the statute's reach to those counties. *See* Act of June 1, 1997, 75th Leg., R.S., ch. 1069, § 2, 1997 Tex. Gen. Laws 4063, 4064 (former

---

[4] A "major environmental rule" is

> a rule the specific intent of which is to protect the environment or reduce risks to human health from environmental exposure and that may adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, or the public health and safety of the state or a sector of the state.

Tex. Gov't Code Ann. § 2001.0225(g)(3) (West 2000).

14

§ 382.0372).  Although Brazoria County acknowledges that, under the current version of the statute, TCEQ does have the authority to adopt I/M rules for any "affected county," it claims that at the time of adoption, the I/M rules for Brazoria County were outside of TCEQ's statutory authority and therefore invalid.  *See* Tex. Health & Safety Code Ann. §§ 382.202, .203 (West 2001 & Supp. 2004).  We believe that Brazoria County misconstrues the controlling statutes.

At the time of the promulgation of the I/M rules, two statutes authorized TCEQ to implement I/M rules.  *See* Act of April 25, 1995, 74th Leg., R.S., ch. 76, § 11.157, 1995 Tex. Gen. Laws 458, 728-30 (former § 382.037); former § 382.0372.  According to former section 382.037, TCEQ could "establish, implement, and administer a program requiring emissions-related inspections of motor vehicles . . . consistent with the requirements of the federal Clean Air Act (42 U.S.C. Section 7401 et seq.)."  *See* former § 382.037(a).  In addition to giving TCEQ the *discretion* to adopt I/M rules consistent with the requirements of the federal Clean Air Act, the legislature *mandated* the adoption of such a program for Dallas, Tarrant, El Paso, and Harris County.  *See* former § 382.0372(a)(1).  The statute that Brazoria County claims limits TCEQ's geographic authority to implement I/M rules in fact mandates action in those geographic areas while leaving the agency with the discretion to act in other geographic areas in a manner consistent with federal law.  *See* former §§ 382.037, 382.0372.  We overrule its fourth issue.

*Inspection and Maintenance Rules and the "Reasoned Justification"*

In its fifth issue, Brazoria County argues that the I/M rules failed to comply with key provisions of the APA by not providing reasoned justification for (i) the rules' phased

15

implementation and (ii) Brazoria County's lack of an "opt out" clause although other HGA counties were given such an option. We disagree.

We review a challenge to the reasoned-justification requirement using an "arbitrary and capricious" standard, with no presumption that facts exist to support the agency's order. *Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 841 (Tex. App.—Austin 2001, no pet.). A reasoned justification must include: (1) a summary of comments the agency received from interested parties; (2) a summary of the factual basis for the rule; and (3) the reasons why the agency disagrees with a party's comments. *Id*. at 840. To satisfy the reasoned-justification requirement, an agency's order adopting a rule must explain how and why the agency reached the conclusion it did. *Id*.

In 1993 and 1994, TCEQ engaged in an intensive data-gathering exercise involving emissions, meteorological patterns, and other elements that would provide data for modeling pollution trends throughout the state. 26 Tex. Reg. at 361. This helped the agency better understand the nature of the ozone air quality problem in the HGA. *Id*. In January of 1995, Texas submitted its first SIP to the EPA in order to achieve federal NAAQ standards. *Id*. Following national environmental studies that led to revisions of the NAAQS, Texas submitted a revised SIP for the HGA in November of 1998. *Id*. at 362. However the EPA stated that it would not approve Texas's SIP until specific control strategies were contained in the models designed to achieve attainment of EPA standards. *Id*. TCEQ used sophisticated, statutorily mandated air-quality grid-modeling to estimate the amount of emission reductions needed to achieve attainment. *Id*. It also considered numerous emission control strategies in developing the modeling. *Id*. To help identify local control strategies for the modeling, TCEQ assembled a group of HGA stakeholders. *Id*. These stakeholders

16

included local government entities, elected officials, environmental groups, industry representatives, consultants, and members of the general public. *Id*. In its final decisions as to which control strategies to implement, TCEQ sought to use those control strategies that significantly contribute to the substantial emissions reductions required by federal law while minimizing the economic and social impact of those control strategies on the governments, businesses, and residents of the HGA. *Id*. at 363. Fourteen public hearings were held around the state regarding the proposed I/M rules. *See id*. at 367. Forty-six persons testified at the I/M rule hearings and 167 submitted written comments. *Id*. Ultimately, a total of 341 persons submitted either written or oral testimony regarding the I/M rules. *Id*.

Brazoria County claims that the county's May 1, 2003, implementation date is without "reasoned justification" because the federally mandated attainment date is not until November 15, 2007. However, TCEQ described its reasons for the "phase-in" approach in great detail. *Id*. at 363. According to its rules, TCEQ would apply the I/M rules to Harris County on May 1, 2002; to Brazoria, Fort Bend, Galveston, and Montgomery Counties on May 1, 2003; and to Chambers, Liberty, and Waller Counties on May 1, 2004. *Id*. TCEQ explained that the "commission is adopting a phased in approach to make for smoother implementation of the adopted I/M program, while still providing significant air quality improvements." *Id*. TCEQ explained that it is reasonable to phase in such a large program rather than implement it at one time. *Id*. It also chose to begin with the areas that produce the most emissions in order to ameliorate the impact on less populous counties that produce fewer emissions. *Id*. Further, although TCEQ anticipates that its air-quality modeling is accurate and will achieve the desired reductions in emissions, the

possibility always remains that the emission-control strategies taken will be insufficient to achieve the federal NAAQS. *Id*. Rather than risk severe sanctions from the federal government for noncompliance, TCEQ left itself sufficient time to revise its models and emission-control strategies in order to ensure compliance by November 15, 2007.[5] *Id*. Given the complicated set of factors that may affect the effectiveness of an air-quality program, we hold that it is reasonable for TCEQ to implement its emission-control strategies in the time frame it proposed in this case.

Second, Brazoria County argues that TCEQ's denial of an "opt out" clause, which was given to other counties in the area, is without reasoned justification. TCEQ received thirteen comments, many from the area's elected officials, requesting that Chambers, Liberty, and Waller Counties be omitted from the proposed program. *Id*. at 363. Additionally, TCEQ explained that the combined anticipated emission reductions from Chambers, Liberty, and Waller Counties, the three counties given the option to develop alternate emission-reduction strategies, represent a tiny fraction of the emission reductions necessary to achieve NAAQS attainment. *Id*. Thus, TCEQ concluded that providing those counties with flexibility was reasonable. *Id*. These explanations sufficiently explain why and how TCEQ reached the conclusion it did. Thus, we conclude that TCEQ provided a reasoned justification for the rule.

### Inspection and Maintenance Rules and the APA's Regulatory Impact Analysis

Also in its fifth issue, Brazoria County argues that TCEQ failed to conduct a regulatory-impact analysis for the I/M rules. *See* Tex. Gov't Code Ann. § 2001.0225(a)(1) (West

---

[5] We note that a mid-course review of the SIP must be submitted to the EPA by May 1, 2004. 26 Tex. Reg. 361, 363 (2001) (codified at 30 Tex. Admin. Code §§ 114.50-.53).

2000). We do not believe that TCEQ was required to perform a regulatory-impact analysis for these rules.

State agencies are required to conduct a regulatory-impact analysis of major environmental rules if, among other reasons, the result of the rule is to exceed a standard set by federal law, unless the rule is specifically required by state law.[6] *Id*. § 2001.0225(a)(1). Brazoria County argues that the I/M rules promulgated by TCEQ for the HGA cover more vehicles than are required by federal I/M rules and are more stringent than federal I/M requirements. Thus, it believes that the I/M rules exceed a federal standard and require a regulatory impact analysis. *See* Environmental Protection Agency Air Programs, 40 C.F.R. §§ 51.350-.373 (2003) (describing federal vehicle inspection and maintenance programs). Additionally, Brazoria County claims that the I/M rules are not specifically required by state law. Rather, they believe that state law permits TCEQ to establish I/M programs but does not require them to do so. *See* Tex. Health & Safety Code Ann. § 382.202 (West 2001 & Supp. 2004). We disagree.

As the agency generally charged with protection of the air quality within the state, TCEQ is responsible for designing and submitting a plan to achieve attainment of the federally mandated NAAQS. *See, e.g.*, *id*. §§ 382.011(a)(2)-(3), .012, .017, .019, .039 (West 2001 & Supp. 2004). Although the federal government requires a state to submit a SIP that identifies specific control strategies that will be used to achieve the NAAQS, it does not mandate the use of any particular control strategies. *See* 42 U.S.C.A. § 7410; *Union Elec. Co. v. United States Envtl. Prot.*

---

[6] Although Brazoria County cited both sections 2001.0225(a)(1) and (2), it only presented argument in its brief that TCEQ violated section 2001.0225(a)(1). *See* Tex. Gov't Code Ann. § 2001.0225(a)(1), (2) (West 2000).

*Agency*, 427 U.S. 246, 266 (1976).  Rather, states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory standards.  *See Union Elec. Co.*, 427 U.S. at 266 ("So long as the national standards are met, the state may select whatever mix of control devices it desires.").

A regulatory-impact analysis is required if the result of the rule is to "exceed a standard set by federal law, unless the rule is specifically required by state law."  Tex. Gov't Code Ann. § 2001.0225(a)(1).  In adopting the I/M rules, TCEQ was attempting to meet, not exceed, the relevant standard set by federal law—the NAAQS.  *See* 25 Tex. Reg. at 5686; 26 Tex. Reg. at 403. The I/M rules are methods and control strategies that Texas has chosen to employ so as to meet the federal NAAQS.  They are not standards themselves.  By focusing on the relationship between TCEQ's I/M rules and the equivalent federal rules, Brazoria County ignores this distinction. Whether TCEQ's I/M rules exceed their federal-rule counterparts is irrelevant.  Because the rules in question were adopted to meet, not exceed, the federal NAAQS, they do not trigger the statutory language requiring a regulatory-impact analysis.[7]

***Inspection and Maintenance Rules and the APA's "Fiscal Note" Requirement***

Brazoria County offers one final argument in relation to its fifth issue—that TCEQ's "fiscal note" failed to include the projected impact of the I/M rules on the revenues of state and local governments, as required by the government code.  *See* Tex. Gov't Code Ann. § 2001.024(a)(4)(C)

---

[7]  Because we decide that the rules are designed to comply with federal standards, it is unnecessary to consider whether the rules are "major environmental rules" or whether they are specifically required by state law.  *See* Tex. Gov't Code Ann. § 2001.0225(a)(1)-(4) (West 2000).

20

(West 2000). In its fiscal note, TCEQ states that it estimates $75,000 in additional annual costs based on approximately 6,300 state and local vehicles that would be required to undergo the newer, more costly emissions testing. *See* 25 Tex. Reg. 8180, 8183-84 (codified at Tex. Admin. Code §§ 114.50-.53) (proposed August 25, 2000).[8] It also states that "for the first five-year period the proposed rules are in effect, the fiscal implication for affected units of state and local government, as a result of vehicle emissions tests, is estimated to be an additional annual cost of $75,000." *Id.* at 8183. Although the fiscal note is silent as to the effect of the rule on state and local revenues, TCEQ argues on appeal that no fiscal issues exist to discuss because there is no effect on state and local revenues. Brazoria County claims that TCEQ's silence as to the potential revenue effects of the I/M rules is a violation of the statute, yet Brazoria County neither cites evidence nor even argues that the I/M rules will actually affect state or local government revenues. TCEQ's assertion that the $75,000 in additional costs are "the fiscal implication for affected units of state and local governments" carries with it a clear implication that there are no other fiscal impacts to the proposed rules. *Id.* We hold that TCEQ's fiscal note fulfills the requirements of the APA.

Because we have rejected all of Brazoria County's arguments regarding the inspection and maintenance rules, we overrule Brazoria County's fifth issue.

---

[8] This entry in the *Texas Register* is the proposed vehicle inspection and maintenance rule and its accompanying commentary. The entry adopting the rule did not reproduce the fiscal note. *See* 26 Tex. Reg. 361 (2001) (codified at 30 Tex. Admin. Code §§ 114.50-.53).

## C.  Lawn-Maintenance Rules

### *Authority to Adopt the Lawn-Maintenance Rules*

In its sixth issue, Brazoria County argues that TCEQ's lawn-maintenance rules violate the health and safety code, which prohibits TCEQ from specifying "a particular method to be used to control or abate air pollution" unless required by federal law.  *See* Tex. Health & Safety Code Ann. § 382.017(f)(1) (West 2001).  As we described above when we discussed the relationship between the I/M rules and the regulatory-impact analysis required by the APA, TCEQ adopted the lawn-maintenance rules in order to comply with federally mandated NAAQ standards.  *See* 42 U.S.C.A §§ 7401-7410.  In addition, federal law specifically requires affected states to adopt rules to limit emissions.  *Id*. § 7410(a)(2)(E).  Because the lawn-maintenance rules were promulgated in order to comply with federal law, the rules are exempt from the legislature's restriction on using a particular method to control or abate air pollution.  *Id*.  We overrule Brazoria County's sixth issue.

### *Lawn-Maintenance Rules and the APA's Regulatory Impact Analysis*

In its seventh issue, Brazoria County argues that TCEQ failed to conduct a regulatory-impact analysis for the lawn-maintenance rules.  *See* Tex. Gov't Code Ann. § 2001.0225(a)(1).  In essence, Brazoria County argues that, because there are no federal rules governing the use of lawn equipment, any state rules regulating their use exceed the federal standard and thereby require a regulatory-impact analysis.[9]  We disagree.

---

[9] Federal lawn-maintenance rules are directed towards the manufacturers of lawn maintenance equipment and do not regulate use.  *See* Environmental Protection Agency Air Programs, 40 C.F.R. §§ 85.1601-.2305 (2003).

As we have noted above, states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory standards. *See Union Elec. Co.*, 427 U.S. at 266. Texas law requires a regulatory-impact analysis only if the result of the rule is to "exceed a standard set by federal law, unless the rule is specifically required by state law." Tex. Gov't Code Ann. § 2001.0225(a)(1).

The lawn-maintenance rules are part of the same regulatory scheme as the inspection and maintenance rules—the attainment of federal NAAQS. In adopting lawn-maintenance rules, TCEQ was only attempting to meet the relevant standard set by federal law. *See* 26 Tex. Reg. at 403. The lawn-maintenance rules are methods and control strategies that Texas has chosen to employ so as to meet the federal NAAQS. Like the inspection and maintenance rules, they are not standards themselves. Because they were adopted only to meet the federal NAAQS, they do not trigger the statutory language requiring a regulatory-impact analysis. We overrule Brazoria County's seventh issue.

**D. Attorney's Fees**

In its final issue, Brazoria County argues that the trial court abused its discretion by denying its request for attorney's fees made under the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 1997). The grant or denial of attorney's fees under the UDJA is within the district court's discretion and will not be reversed on appeal absent a showing that the court abused its discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985); *Del Valle Indep. Sch. Dist. v. Lopez*, 863 S.W.2d 507, 513 (Tex. App.—Austin 1993, writ denied). A trial court abuses its discretion if its decision is arbitrary, unreasonable, or if the court

acted without reference to guiding legal rules and principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). The legal principle encompassed in the term "abuse of discretion" concerns a legal error committed by the trial court that injured or prejudiced appellants. *Lopez*, 863 S.W.2d at 513.

The trial court ruled against Brazoria County on all issues. Although a trial court may award attorney's fees to the non-prevailing party, it did not do so for Brazoria County. *See J.C. Penney Life Ins. Co. v. Heinrich*, 32 S.W.3d 280, 290 (Tex. App.—San Antonio 2000, pet. denied). Brazoria County argues that the court failed to recognize that it could have awarded attorney's fees to the non-prevailing party and that this failure to apply the correct legal standard constitutes an abuse of discretion. Although the trial court did base its denial of attorney's fees on the fact that Brazoria County did not prevail, it is not clear from the record that the trial court was applying an incorrect legal standard. Furthermore, a trial court is well within its discretion to deny or award attorney's fees based on the outcome of the case. *John G. & Stella Kenedy Mem'l Found. v. Dewhurst*, 994 S.W.2d 285, 309 (Tex. App.—Austin 1999), *rev'd on other grounds*, 90 S.W.3d 268 (Tex. 2002). The denial of attorney's fees to Brazoria County was within the discretion of the trial court.[10] We overrule Brazoria County's eighth issue

---

[10] Brazoria County also complains that the trial court failed to provide Brazoria County's requested findings of fact and conclusions of law. The test of whether this constitutes harm is whether the circumstances of the particular case would require an appellant to guess the reason or reasons that the trial judge ruled against it. *Sheldon Pollack Corp. v. Pioneer Concrete of Tex., Inc.*, 765 S.W.2d 843, 845 (Tex. App.—Dallas 1989, writ denied). In this case, the trial court stated that its denial of attorney's fees to Brazoria County was based on the fact that they did not prevail on any of the issues. Thus, Brazoria County was not harmed by the trial court's failure to provide findings of fact and conclusions of law.

## CONCLUSION

Because we overrule all of Brazoria County's issues, we affirm the judgment of the trial court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed:   February 12, 2004